Alok Ahuja, Judge
Mike Louis is the proponent of a referendum petition concerning "right to work" legislation. Louis and Secretary of State John R. Ashcroft appeal from a judgment of the Circuit Court of Cole County, which found that the Secretary's summary statement for the referendum petition was unfair and insufficient. We reverse.
*706 Factual Background
On February 2, 2017, the General Assembly passed Senate Substitute Number 2 for Senate Bill 19 ("SB 19"). SB 19 is the type of legislation commonly referred to as a "right to work" law. The Governor signed the bill into law on February 6, 2017. The legislation is scheduled to become effective on August 28, 2017.
SB 19 enacts a new § 290.590, RSMo. Section 290.590 provides in subsection 2:
2. No person shall be required as a condition or continuation of employment[1 ] to:
(1) Become, remain, or refrain from becoming a member of a labor organization; [or]
(2) Pay any dues, fees, assessments, or other similar charges however denominated of any kind or amount to a labor organization....
The statute provides in sub-section 3 that
[a]ny agreement, understanding, or practice, written or oral, implied or expressed, between any labor organization and employer that violates the rights of employees as guaranteed under this section is unlawful, null and void, and of no legal effect.
The bill provides civil and criminal remedies for violations.
Sub-section 7 of new § 290.590 contains a number of exemptions. Among other things, sub-section 7(5) provides that
This section shall not apply ... [t]o any agreement between an employer and a labor organization entered into before the effective date of this section but shall apply to any such agreement upon its renewal, extension, amendment, or modification in any respect after the effective date of this section.
We have reproduced the full text of SB 19 in an Appendix to this opinion.
Appellant Mike Louis is the President of the Missouri AFL-CIO, a federation of Missouri labor unions. On February 21, 2017, Louis submitted to the Secretary of State a sample referendum petition, which proposed that SB 19 "shall be referred to the voters of the State of Missouri, for their approval or rejection." The referendum petition was assigned petition number 2018-R002 by the Secretary.
The referendum petition is not Louis' only effort to prevent Missouri from becoming or remaining a "right to work" state. In November 2016, prior to his submission of the referendum petition, Louis submitted ten initiative petitions to the Secretary of State, each seeking to amend Article I, Section 29 of the Missouri Constitution to prohibit the State from enacting "right to work" legislation. Adoption of any of Louis' proposed constitutional amendments would require a "yes" vote. See Hill v. Ashcroft , 526 S.W.3d 299 (Mo. App. W.D. 2017) (decision addressing official ballot titles for Louis' initiative petitions).
The Secretary prepared a summary statement for Louis' referendum petition, which was approved by the Attorney General. The Secretary's summary statement read:
Do the people of the state of Missouri want to adopt Senate Bill 19 ("Right-to-Work") as passed by the general assembly in 2017, which prohibits as a condition of employment the forced membership in a labor organization (union) or forced payments of dues in full or pro-rata (fair-share); make any activity *707 which violates employees' rights illegal and ineffective; allow legal remedies for anyone injured as a result of another person violating or threatening to violate employees' rights; and which shall not apply to union agreements entered into before the effective date of Senate Bill 19?
On March 28, 2017, the Secretary certified the official ballot title for the referendum petition, which included his summary statement, as well as a fiscal note summary prepared by the State Auditor.
On April 7, 2017, Respondents Roger Bruce Stickler, Mary Hill and Michael J. Briggs (the "Stickler plaintiffs") filed their Petition to Challenge Official Ballot Title to Initiative Petition 2018-R002 in the Circuit Court of Cole County. Respondent John Paul Evans filed a similar petition on the same date. Both petitions named the Secretary of State as the sole defendant, and raised multiple objections to the summary statement prepared by the Secretary. The plaintiffs did not challenge the fiscal note summary prepared by the Auditor in either case. The circuit court granted Louis leave to intervene in both cases.
The parties filed cross-motions for judgment on the pleadings. Although the cases were not formally consolidated, the circuit court held a combined hearing in the two cases, during which it heard argument of counsel. Following the hearing, the trial court entered a single judgment resolving both cases on June 22, 2017. In its judgment, the circuit court determined that the Secretary of State's summary statement was unfair and insufficient in the following respects:
1. It is improperly, unfairly, and insufficiently constructed, insofar as it contains subject-verb disagreement in identifying SB 19's effect, noting what it "prohibits," but also stating that it "make" activity illegal and "allow" legal remedies. The People are entitled to consider a question which is phrased in a grammatically-competent manner.
2. It is improperly, unfairly, and insufficiently constructed, insofar as it requires an affirmative vote (asking the People to "adopt") to preserve the Right to Work law, SB 19, even though it has already been enacted into law by the General Assembly and the Governor. The Court finds that it is of paramount importance that the summary statement reflect that the ballot measure is a referendum.
3. It is improperly, unfairly, and insufficiently constructed, insofar as-when coupled with the [proposed] constitutional amendments also submitted by [Louis]-its phrasing has the potential for creating voter confusion insofar as preservation of the Right to Work law would require an affirmative vote for Referendum 2018-R002, and a negative vote(s) on one or more of the initiatives for constitutional amendments submitted by the same Proponent of both.... [T]he language here presents a quintessential example of a situation-whether inadvertent or otherwise-where voter confusion is likely, and easily avoidable by framing the Referendum in a manner which more closely reflects the People's veto of a duly-enacted statute which the Proponent seeks, and consistent with the Proponent's other efforts.
4. It is improperly, unfairly, and insufficiently constructed insofar as it asks "Do the people of the state of Missouri want ..." rather than the more formal (and more succinct) "Shall the people of the state of Missouri...."
5. It is improperly, unfairly, and insufficiently constructed insofar as it incompletely represents that SB 19 was "passed by the general assembly in 2017," rather than accurately stating *708 that SB 19 was "enacted into law in 2017."
6. It is improperly, unfairly, and insufficiently constructed insofar as it refers parenthetically to the requirement for the payment of union dues, or a portion thereof, as a condition of employment with the value-laden term "fair share." While the same might be said of the two instances of use of the word "forced," that language has not been challenged here, but is sufficiently addressed by use of the term "as a condition of employment," rendering the use of the word "forced" redundant.
7. It is improperly, unfairly, and insufficiently constructed insofar as it refers generally to "employee rights," rather than narrowly, succinctly, and with adequate specificity focusing upon those limited "rights" which are protected by the Right to Work law, and for which legal remedies are created.
8. It is improperly, unfairly, and insufficiently constructed insofar as it refers inaccurately and unnecessarily to "union agreements" to which the Right to Work law, SB 19, would not apply.
Based on the deficiencies it identified, the circuit court refused to certify the Secretary's summary statement. The court instead certified the following alternative language:
Shall the people of the state of Missouri reject Senate Bill 19 ("Right to Work"), enacted in 2017, which: (1) prohibits as a condition of employment membership in, or payments of dues or fees in full or in part to, a labor organization (union); (2) makes any agreement or activity violating its provisions illegal and ineffective; and (3) allows legal remedies for anyone injured as a result of violations or threats of violations of its provisions?
The Secretary of State and referendum proponent Louis appeal.[2]
Standard of Review
"De novo review of the trial court's legal conclusions about the propriety of the secretary of state's summary statement ... is the appropriate standard of review when there is no underlying factual dispute that would require deference to the trial court's factual findings." Brown v. Carnahan , 370 S.W.3d 637, 653 (Mo. banc 2012) (citation omitted). The fact that these cases were resolved on cross-motions for judgment on the pleadings confirms the lack of any disputed factual issues. See , e.g. , Pestka v. State , 493 S.W.3d 405, 408 (Mo. banc 2016) (judgment on the pleadings is properly granted where, " 'from the face of the pleadings, the moving party is entitled to a judgment as a matter of law.' " (citation omitted)).
Analysis
The Secretary and Louis challenge each of the eight purported deficiencies the circuit court identified in the summary statement. We consider the issues in the order in which they are discussed in the circuit court's judgment. We begin, however, by reviewing the legal standards applicable to the Secretary's summary statement.
I.
Section 116.334.1[3] specifies that, if a referendum or initiative petition is approved as to form,
*709 the secretary of state shall prepare and transmit to the attorney general a summary statement of the measure which shall be a concise statement not exceeding one hundred words. This statement shall be in the form of a question using language neither intentionally argumentative nor likely to create prejudice either for or against the proposed measure.
Section 116.190.3 permits citizens to challenge a proposed summary statement on the basis that it "is insufficient or unfair."
When reviewing whether the secretary of state ... ha[s] complied with the fairness and sufficiency requirements under section 116.190, this Court considers that " 'insufficient' means inadequate; especially lacking adequate power, capacity, or competence" and " 'unfair' means to be marked by injustice, partiality, or deception."
Brown , 370 S.W.3d at 653 (citations omitted). In Brown , the Supreme Court explained that to satisfy the statutory standards,
the summary statement must be adequate and state the consequences of the initiative without bias, prejudice, deception, or favoritism. The language used should fairly and impartially summarize the purposes of the measure so that voters will not be deceived or misled. It should accurately reflect the legal and probable effects of the proposed initiative. Sometimes it is necessary for the secretary of state's summary statement to provide a context reference that will enable voters to understand the effect of the proposed change.
...
Requiring fairness and sufficiency of an initiative's summary statement ... reflects that there are procedural safeguards in the initiative process that are designed either, (1) to promote an informed understanding by the people of the probable effects of the proposed amendment, or (2) to prevent a self-serving faction from imposing its will upon the people without their full realization of the effects of the amendment. Initiative process safeguards assure that the desirability of the proposed amendment may be best judged by the people in the voting booth.
Brown , 370 S.W.3d at 654 (citations and internal quotation marks omitted); see also , e.g. , Dotson v. Kander , 464 S.W.3d 190, 195-96 (Mo. banc 2015) ; Shoemyer v. Mo. Sec'y of State , 464 S.W.3d 171, 174 (Mo. banc 2015).
The summary statement should inform voters of the "central feature[s]" of the initiative or referendum proposal. Boeving v. Kander , 493 S.W.3d 865, 875 (Mo. App. W.D. 2016) (quoting Seay v. Jones , 439 S.W.3d 881, 891 (Mo. App. W.D. 2014) ); see also Hill v. Ashcroft , 526 S.W.3d 299, 328 (Mo. App. W.D. 2017) (finding summary statement insufficient where it failed to describe "an important and fundamental part" of the initiative).[4] At the same time, "[t]he summary statement need not set out the details of the proposal to be fair and sufficient. The test is not whether increased specificity and accuracy would be preferable or provide the best summary." Brown , 370 S.W.3d at 656 (citations and internal quotation marks omitted).
*710 "even if the language proposed by [the opponents] is more specific, and even if that level of specificity might be preferable, whether the summary statement prepared by the Secretary of State is the best language for describing the referendum is not the test."
Id. at 664 (quoting Bergman v. Mills , 988 S.W.2d 84, 92 (Mo. App. W.D. 1999) ). As we have recognized,
"If charged with the task of preparing the summary statement for a ballot initiative, ten different writers would produce ten different versions." There is no uniquely correct language for a summary statement to which the drafter must adhere; to the contrary, "there are many appropriate and adequate ways of writing the summary ballot language."
Seay , 439 S.W.3d at 889 (quoting Asher v. Carnahan , 268 S.W.3d 427, 431, 432 (Mo. App. W.D. 2008) ).
II.
With these general principles in mind, we turn to the specific defects in the Secretary's summary statement identified by the circuit court.
A.
The circuit court concluded that the Secretary's summary statement was unfair and insufficient, first, because "it contains subject-verb disagreement in identifying SB 19's effect."
The Secretary candidly acknowledges that "[t]he Secretary's summary statement includes two subject-verb disagreements; the verbs 'make' and 'allow' in the original summary statement should [end with an 's']."[5] The Secretary argues, nevertheless, that these clerical errors do not make the summary statement unfair and insufficient, and did not empower the circuit court to rewrite the summary. We agree.
The circuit court may be correct that the summary statement was not drafted "in a grammatically-competent manner," and these grammatical errors may indeed be "embarrassing" (as the Stickler plaintiffs argue). But grammatical competence, and the avoidance of embarrassment, are not the tests for gauging the summary's legal sufficiency. Instead, the question for the circuit court, and for this Court, is whether the summary statement contains an impartial, intelligible, and accurate summary of the referendum's central purpose and effects. The subject-verb disagreements identified by the circuit court, although perhaps regrettable, did not render the summary statement biased, inaccurate, or misleading, and those grammatical errors therefore provided the circuit court with no basis to revise the summary statement.
The Missouri Supreme Court has emphasized that "[t]he ability of the voters to get before their fellow voters issues they deem significant should not be thwarted in preference for technical formalities." United Labor Comm. of Mo. v. Kirkpatrick , 572 S.W.2d 449, 454 (Mo. banc 1978) ; accord , Comm. for a Healthy Future v. Carnahan , 201 S.W.3d 503, 512 (Mo. banc 2006). In this vein, the statute specifying the form of referendum petitions instructs that a petition is sufficient "[i]f this form is followed substantially"; "clerical and merely technical errors" should be "disregard[ed]." § 116.030.
In a variety of contexts, Missouri courts have held that grammatical errors which do not alter or obscure the sense of *711 a statute or legal instrument do not prevent the document from becoming effective. The Supreme Court declared many years ago that "neither bad punctuation nor false grammatical construction will render a statute inoperative if its meaning is plain and susceptible of easy interpretation." Richardson v. Vrooman , 44 Mo. 440, 442 (1869). This Court similarly stated that "a little bad grammar will not annul" an otherwise valid deed of trust. Ray v. Crouch , 10 Mo. App. 321, 326 (1881) (citation omitted).[6] There is no justification for applying more exacting standards of grammatical correctness in this context, where the Supreme Court has admonished us to disregard "technical formalities." Unless grammatical errors render a summary statement inaccurate, misleading, or unfair, the circuit court has no authority under § 116.190.4 to correct them.
Respondent Evans argues that the subject-verb disagreements in the Secretary's summary could mislead petition signers or voters. Evans contends that the Secretary's statement could be read so that the subject of the verbs "make" and "allow" is "the people of the state of Missouri," rather than the intended subject ("Senate Bill 19"). This potential mis-reading of the summary statement is illustrated in the footnote.[7] According to Evans, the subject-verb disagreement may mislead Missourians into thinking that "the measure concerns discrete items separate and apart from SB 19."
While the wording of the Secretary's summary statement may not be ideal, there is no real risk that voters will mis-read the summary in the manner Evans postulates. The purpose of the referendum is clearly stated at the outset: whether "to adopt Senate Bill 19 ('Right-to-Work') as passed by the general assembly in 2017." This objective is set forth in the summary statement's first clause, which is separated from what follows by a comma. The remainder of the summary, consisting of four relative or subordinate clauses, is clearly subject to this over-arching purpose. It is also significant that the final clause of the summary statement ("and which shall not apply to union agreements entered into before the effective date of Senate Bill 19") clearly refers back to SB 19, and not to the introductory phrase ("[d]o the people of the state of Missouri want to"). Thus, the intervening clauses, which contain the incorrect *712 verb forms, are "book-ended" by clauses clearly stating that the entirety of the summary refers to the adoption or rejection of SB 19.
Because the subject-verb disagreements on which the circuit court relied do not render the summary statement unfair or insufficient, the circuit court erred by revising the summary statement to correct them.
B.
The circuit court's second and third objections concern the summary's phrasing of the question in the affirmative (whether voters wished to "adopt" SB 19), rather than in the negative (whether they wished to "reject" SB 19). According to the circuit court, the affirmative phrasing failed to acknowledge that SB 19 "has already been enacted into law by the General Assembly and the Governor." The court also believed that the affirmative phrasing of the referendum question would create confusion in relation to Louis' initiative petitions, since an affirmative vote on any of the initiatives would adopt a constitutional amendment that would prohibit "right to work" legislation, while an affirmative vote on the referendum would adopt such legislation.
Only the Stickler plaintiffs object to the summary statement's affirmative framing of the referendum question. For his part, Evans acknowledges that the Secretary properly framed the question in the affirmative.
1.
The relevant provisions of the Missouri Constitution do not prohibit the summary statement from being worded in the affirmative; indeed, the Constitution suggests that an affirmative wording is more appropriate. Article III, § 49 of the Missouri Constitution provides that "[t]he people reserve power to approve or reject by referendum any act of the general assembly." (Emphasis added.) As the Stickler plaintiffs acknowledge, "[t]he power reserved by the people by virtue of this provision is stated in the disjunctive 'or' (as in 'approve or reject'), such that there is no particular preferred form stated or implied in this language." While Article III, § 49 may be ambivalent, the Stickler plaintiffs ignore Article III, § 52(b), which provides that "[a]ny measure referred to the people shall take effect when approved by a majority of the votes cast thereon, and not otherwise." (Emphasis added.) Similarly, § 116.320.1 provides that "[e]ach statewide ballot measure receiving a majority of affirmative votes is adopted." (Emphasis added.) Article III, § 52(b) and § 116.320.1 plainly contemplate that referendum questions will be framed in the affirmative, asking voters whether they wish to "approve[ ]" a particular measure.[8]
*713 The Missouri Supreme Court has likewise described the referendum process in a way which requires affirmative voter approval of the referred measure. The Court explained that
[the] "[p]urpose of referendum is to suspend or annul a law which has not gone into effect and to provide the people a means of giving expression to a legislative proposition, and require their approval before it become operative as a law[.]"
State ex rel. Moore v. Toberman , 363 Mo. 245,250 S.W.2d 701, 706 (Mo. banc 1952) (emphasis added; citation omitted).[9]
It also appears that the uniform practice in Missouri since the adoption of the referendum mechanism has been to require an affirmative vote in order for a referred measure to be adopted. See Bergman v. Mills , 988 S.W.2d 84, 92-93 (Mo. App. W.D. 1999) ; Att'y Gen. Op. No. 133-2006 (July 10, 2006); Att'y Gen. Op. No. 140-2002 (May 28, 2002); Att'y Gen. Op. No. 182 (Nov. 13, 1981); Att'y Gen. Op. No. 140 (Jan. 28, 1970); David C. Valentine, Constitutional Amendments, Statutory Revision and Referenda Submitted to the Voters by the General Assembly or by Initiative Petition, 1910-2008 , Report 25-2008, at 12 (December 2008) (listing referenda placed before voters, along with the results of the elections; noting that "[t]he referendum is on the bill approved by the General Assembly and, thus, a 'no' vote is a vote against that act.").[10]
By asking in the affirmative whether the people wished to "adopt" SB 19, the Secretary of State framed the referendum question consistently with Missouri constitutional and statutory provisions, the Supreme Court's description of the referendum mechanism, and the uniform practice of prior election officials. The circuit court erred in declaring the summary statement to be unfair and insufficient because it was worded affirmatively.[11]
2.
The circuit court also concluded that the affirmative wording of the referendum question was unfair in light of the initiative petitions Louis had also filed with the Secretary of State.
The Secretary of State cannot be required to modify the summary statement for the current referendum petition based on the fact that Louis has also submitted *714 ten separate initiative petitions to the Secretary. At the current time, it is purely speculative whether Louis will circulate any of the initiative petitions for signature and, if he does, whether one or more of them will garner sufficient signatures to be placed on the ballot.
We rejected a similar argument in Hill v. Ashcroft , 526 S.W.3d 299 (Mo. App. W.D. 2017), which addressed the fairness and adequacy of the summary statements for Louis' initiative petitions. In that case, initiative opponents argued that the Secretary's summary statements were insufficient, because the summaries did not refer to the fact that adoption of any of Louis' proposed constitutional amendments would have the effect of invalidating SB 19 (which had not yet been passed at the time the Secretary drafted the summaries). We rejected the argument that the summary statements were insufficient for failing to mention SB 19: "[w]hile ... sometimes it is necessary for ... the summary statement to provide a context reference for the initiative petition, we do not find that failure to do so, where the consequences are potentially ever changing due to the political landscape , will always render the summary insufficient." Hill , 526 S.W.3d at 314 (emphasis added; citation and internal quotation marks omitted).
Our observation in Hill applies with even greater force in this case. At the time of our decision in Hill , SB 19 had been passed by the legislature and signed by the Governor; yet we held that it was unnecessary for the summary statements to reference it. In this case, even as of today, it is completely hypothetical whether any of Louis' initiative proposals will appear on the ballot. The Secretary cannot be expected to draft a summary to account for events which may never occur.
We also note that Missouri's election statutes refer to the possibility that various measures which appear on an election ballot may conflict with one another, or may cause confusion when placed side-by-side. Thus, § 116.185 provides that
Before the ballot is printed, if the title of a ballot issue is identical or substantially identical to the title of another ballot issue that will appear on the same ballot, the election authority shall promptly notify the officer or entity that certifies the election of the identical or substantially identical title, and if such officer or entity submits a new title to the election authority, the election authority may change the title of the ballot issue prior to printing the official ballot.
Section 116.320 also addresses the situation in which voters actually approve, at the same election, conflicting constitutional or statutory provisions:
2. If voters approve two or more conflicting statutes at the same election, the statute receiving the largest affirmative vote shall prevail, even if that statute did not receive the greatest majority of affirmative votes.
3. If voters approve two or more conflicting constitutional amendments at the same election, the amendment receiving the largest affirmative vote shall prevail, even if that amendment did not receive the greatest majority of affirmative votes.
Several things are noteworthy about these statutes. First, they plainly contemplate that conflicting or related measures may appear simultaneously on the ballot.[12]
*715 Second, these statutes do not require that any action be taken, because of the potential conflict among ballot measures, before it is known what items will actually appear on the election ballot. Finally, none of these statutory provisions authorizes relief in the circumstances of this case. This is not a case in which the ballot title for the referendum petition will be "identical or substantially identical" to the ballot titles of one or more of Louis' initiative petitions. Moreover, if voters simultaneously approve the referendum and one or more of Louis' initiative petitions, this will not be a case of a conflict between two approved statutory provisions (§ 116.320.2), or between two approved constitutional provisions (§ 116.320.3). The fact that the election statutes provide no relief in the circumstances of this case, when they do address other situations involving conflicting or overlapping ballot measures, is significant.
The appropriate way to deal with the possibility that multiple "right to work" measures may appear on the ballot simultaneously is to ensure that each individual measure is presented to voters in a form that is unbiased, accurate, and easily intelligible. The potential for confusion between the present referendum petition, and Louis' separate initiative petitions, provided no basis for the circuit court to revise the Secretary's summary statement.[13]
C.
The trial court determined that the summary statement's introductory phrase ("Do the people of the state of Missouri want") was "improperly, unfairly, and insufficiently constructed," and should be replaced with "the more formal (and more succinct)" phrase "Shall the people of the state of Missouri."
Like grammatical competence and avoidance of embarrassment, considerations of formality and succinctness do not provide a sufficient basis for rejecting the Secretary of State's summary statement, unless that summary statement is otherwise insufficient and unfair.
The introductory phrase used by the Secretary is not insufficient or unfair. While that language may be unusual, and may be notably less formal than the language used in earlier ballot questions, the Secretary obviously made the considered decision to employ everyday, colloquial language. There is nothing in the Secretary's language which is argumentative, misleading, or likely to create prejudice for or against the proposed measure. While the circuit court may have preferred greater formality, many have argued that legal writing is more intelligible when it is less formal.
Respondents argue that using the phrase "do the people of the state of Missouri want to adopt" may mislead voters to believe that, rather than casting a legally effective vote to adopt a statute, they are answering an "advisory opinion poll" asking for their views as to what Missourians as a whole would prefer.
*716 We are unpersuaded. Both at the petition and election stage, voters will be aware of the legal importance of the actions they are taking. As required by § 116.030, the referendum petition advises voters that, by signing the petition, they are "respectfully order[ing] that [SB 19] ... shall be referred to the voters of the State of Missouri, for their approval or rejection, at the general election to be held on the 6th day of November, 2018." Moreover, the petition form prominently advises potential signers that it is a criminal offense for them to sign the petition more than once, to sign if they are not a registered voter, or to sign in any name other than their own. Given the clear language on the petition form, no voter who is paying reasonable attention will fail to recognize that affixing their signature to the petition is a legally significant action, not merely a response to an opinion poll or survey.
If Referendum 2018-R002 appears on the November 2018 general election ballot, it will appear under the following series of headings: "OFFICIAL BALLOT STATE OF MISSOURI," "STATUTORY MEASURES," and finally, "Referendum ordered by petition." See §§ 116.230.2, .4. This series of headings will make clear to voters that they are being asked to take action on a proposed statute. The summary statement itself asks whether the measure should be "adopt[ed]." Moreover, quite apart from the language on the ballot, to cast a vote on the referendum Missouri voters will, on election day: present themselves at a polling place; verify their identity and establish their status as registered voters; enter a voting booth; and complete an "official ballot." We presume that, in taking these actions, voters will be mindful that "elections have consequences," and will recognize that the votes they are casting, if joined by a sufficient number of other votes, will have practical legal effects. Voters will not be deceived by the Secretary's summary statement into believing they are merely responding to an opinion poll.
The Respondents argue that the Secretary's summary suggests to voters that they are being asked for their views on what other people want, rather than to express their own policy preferences. Thus, Respondent Evans argues that "[t]he Secretary's Summary does not ask the individual voter to make a choice about whether he or she wishes to adopt Senate Bill 19." But even the alternative language adopted by the circuit court ("Shall the people of the state of Missouri") or suggested by Evans ("Shall Missouri law be amended to") fails to explicitly ask voters for their own preferences, as opposed to asking questions concerning actions the State, or a majority of its people, should take. The only way to absolutely avoid this potential source of confusion would be to advise voters explicitly that they are being asked to express their own, personal policy preferences, and to explain to them that, if their votes coincide with the majority of other votes cast at the election, then their policy preferences will become Missouri law. We do not believe such elementary instructions are required (nor could they be easily accommodated within a 100-word summary). We presume that voters understand what the act of voting means.
Even if the circuit court's language were considered "better" (a question on which reasonable minds might disagree), "whether the summary statement prepared by the Secretary of State is the best language for describing the referendum is not the test." Brown , 370 S.W.3d at 664 (citation omitted). Because the introductory phrase employed in the Secretary's summary statement was not unfair or insufficient, the circuit court had no reason to rewrite it.
*717 D.
The fifth deficiency identified by the circuit court was that the Secretary of State's summary statement recited that SB 19 had been "passed by the general assembly in 2017," rather than that it was "enacted in 2017."
Section 116.030, which prescribes the form of referendum petitions, requires that such petitions begin with the following language:
We, the undersigned, registered voters of the State of Missouri and.......... County (or City of St. Louis), respectfully order that the Senate (or House) Bill No..... entitled (title of law), passed by the .......... general assembly of the State of Missouri, at the.......... regular (or special) session of the.......... general assembly, shall be referred to the voters of the State of Missouri, for their approval or rejection[.]
(Emphasis added). Section 116.030 requires that referendum petitions describe the matter to be referred to the people as a bill "passed by the general assembly." If this language is sufficiently informative for a referendum petition, we fail to see how that same language could be deemed unfair and insufficient when it appears in the Secretary's summary statement.
Use of the phrase "passed by" may actually be more accurate than using the word "enacted." The dictionary defines "enact" as "to establish by legal and authoritative act: make into a law; esp : to perform the last act of legislation upon (a bill) that gives the validity of law." WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE 745 (unabridged ed. 1993). Thus, use of the verb "enact" may suggest that SB 19 actually became effective as law. But-assuming the referendum petition receives sufficient signatures-SB 19 will be "suspend[ed] or annul[led]," Toberman , 250 S.W.2d at 706, and will not take effect as law unless and until it is approved by a majority of voters.
In any event, even if the circuit court were correct that the phrase "enacted in 2017" is more precise than "passed by the general assembly in 2017," it is not the court's job to draft a better summary statement, so long as the Secretary's language is not misleading or confusing.
The circuit court erred by rewriting the summary's statement that SB 19 had been "passed by the general assembly in 2017."
E.
The sixth defect addressed by the circuit court was the summary's reference to the payment of a pro-rata share of union dues as a "fair share." The circuit court held that the term "fair share" was a "value-laden term" which suggested that such dues payments were just and equitable.
The term "fair share" has been frequently used in judicial opinions to refer to dues paid by non-union members who are part of a bargaining unit represented by a union.[14] The term was used in the summary *718 statement in parentheses, plainly indicating that the term was intended as a colloquial shorthand expression to help voters understand that SB 19 addressed, among other things, mandatory union representation fees. To the extent the term may be "value-laden," and may suggest that such dues payments are equitable or justifiable, it does not stand alone; the term is preceded, and counter-balanced, by the statement that such dues payments would be required "as a condition of employment," and that the payments are "forced." We note that the term "forced" is itself a "value-laden term," and one that is arguably redundant, given the separate explanation that dues payments are required as a condition of employment.[15] The Secretary's summary statement also uses two other shorthand expressions in parentheses, "Right-to-Work" and "union." While "union" may be a relatively neutral expression, it could be argued with some force that the term "Right-to-Work"-which appears nowhere in SB 19's text-is a more heavily freighted term than "fair share," and that it cuts in the opposite direction.[16]
As Respondent Evans observes, "[t]here is a long and bitter disagreement in this country about whether" employees can be required to become members of, or support, a labor organization as a condition of employment. In this contentious environment, the Secretary of State was charged with summarizing referendum 2018-R002 in language that was familiar and easily understood, but also unbiased. Considering the overall language of the summary statement, and the context in which the words "fair share" appear, the use of the term did not make the summary statement unfairly partial or deceptive.
F.
The circuit court found that the summary statement's reference to the protection of "employee rights" was overly broad, because it failed to "narrowly, succinctly, and with adequate specificity focus[ ] upon those limited 'rights' which are protected by the Right to Work law."
In § II.A, above, we rejected Respondent Evans' contention that the subject-verb disagreement in the summary statement would permit voters to conclude that, if they voted affirmatively on the referendum, they would be creating "employee rights" untethered to SB 19. As we explained in § II.A, the "employee rights" referenced in the summary's second subordinate clause are clearly limited to the rights created by SB 19. The summary clearly explains that the over-arching purpose of the referendum is to adopt SB 19; the relative or subordinate clauses which follow are clearly subject to that overriding purpose; and the final clause, which refers back to SB 19, makes clear that all of the clauses describe aspects of SB 19.
What we said in § II.A fully addresses the seventh purported defect found by the *719 circuit court. There was no need to more specifically limit the "employee rights" referenced in the summary, because the limitation to the rights created by SB 19 was already self-evident in context.
G.
Finally, the circuit court found that the summary statement was inaccurate because it "refer[red] inaccurately and unnecessarily to 'union agreements' to which the Right to Work law, SB 19, would not apply." The circuit court's revised summary statement makes no reference to the fact that SB 19 will not apply to pre-existing collective bargaining agreements.
We disagree that the reference to SB 19's exclusion of pre-existing agreements was inaccurate, or that it was unnecessary. Sub-section 7(5) of the new § 290.590 explicitly provides that the new statute will not apply "[t]o any agreement ... entered into before the effective date of this section." The Secretary's language mirrored the statutory text, explaining that SB 19 will "not apply to union agreements entered into before the effective date of Senate Bill 19."
Respondents argue that the Secretary's summary was inaccurate because it failed to explain that pre-existing agreements would become subject to SB 19 if those agreements were renewed, extended, amended, or modified in any respect. Such a reference was not necessary. A renewed, extended, amended, or modified collective bargaining agreement is not the same "union agreement[ ] entered into before the effective date of Senate Bill 19"; instead, the pre-existing agreement has been altered in some fashion by agreement of the parties. The fact that pre-existing collective bargaining agreements could become subject to SB 19 if those agreements were renewed, extended, amended, or modified does not make it inaccurate to say that the pre-existing agreements, themselves, would not be subject to SB 19. The manner in which grandfathered agreements could become subject to SB 19 was a detail to which the Secretary was not required to refer within the confines of a 100-word summary statement.
We also disagree with the circuit court's conclusion that the summary's reference to the grandfather clause was unnecessary. Many Missouri workers are currently subject to collective bargaining agreements. While reference to the grandfather clause may not have been required , the Secretary could rightfully conclude that it would be helpful for voters to be informed how SB 19 would affect the existing collective bargaining agreements to which many Missouri workers are subject.
Conclusion
The circuit court erroneously concluded that the summary statement prepared by the Secretary of State for referendum 2018-R002 was unfair and insufficient. To the contrary, the Secretary's summary statement is fair and sufficient, and the circuit court should have certified the summary statement in its original form, rather than rewriting it. The judgment of the circuit court is reversed.[17]
Pursuant to Rule 84.14, we are directed to "dispose finally of the case" "[u]nless justice otherwise requires," by "giv[ing]
*720 such judgment as the [trial] court ought to give." Accordingly, pursuant to § 116.190.4, we certify to the Secretary of State the following summary statement portion of the official ballot title for referendum 2018-R002 (which corresponds to the language originally certified by the Secretary on March 28, 2017):
Do the people of the state of Missouri want to adopt Senate Bill 19 ("Right-to-Work") as passed by the general assembly in 2017, which prohibits as a condition of employment the forced membership in a labor organization (union) or forced payments of dues in full or pro-rata (fair-share); make any activity which violates employees' rights illegal and ineffective; allow legal remedies for anyone injured as a result of another person violating or threatening to violate employees' rights; and which shall not apply to union agreements entered into before the effective date of Senate Bill 19?
All concur.
Attachment
Appendix to Opinion (Full Text of SB 19)
FIRST REGULAR SESSION
[TRULY AGREED TO AND FINALLY PASSED]
SENATE SUBSTITUTE NO. 2 FOR
SENATE BILL NO. 19
99TH GENERAL ASSEMBLY
2017
AN ACT
To amend chapter 290, RSMo, by adding thereto one new section relating to labor organizations, with penalty provisions.
Be it enacted by the General Assembly of the State of Missouri, as follows:
Section A. Chapter 290, RSMo, is amended by adding thereto one new section, to be known as section 290.590, to read as follows:
290.590. 1. As used in this section, the following terms shall mean:
(1) "Employer", any individual, organization, partnership, state agency, political subdivision, corporation, or other legal entity which employs or has employed one or more individuals performing services for the entity within this state; and
(2) "Labor organization", any organization of any kind or agency, or employee representation committee or union which exists for the purpose in whole or in part of dealing with employers concerning wages, rates of pay, hours of work, other conditions of employment, or other forms of compensation.
2. No person shall be required as a condition or continuation of employment to:
(1) Become, remain, or refrain from becoming a member of a labor organization;
(2) Pay any dues, fees, assessments, or other similar charges however denominated of any kind or amount to a labor organization; or
(3) In lieu of the payments listed under subdivision (2) of this subsection, pay to any charity or other third party any amount equivalent to, or on a pro rata basis, any dues, fees, assessments, or other charges required of members of a labor organization.
3. Any agreement, understanding, or practice, written or oral, implied or expressed, between any labor organization and employer that violates the rights of employees as guaranteed under this section *721 is unlawful, null and void, and of no legal effect.
4. Any person who violates or directs another to violate any provision of this section shall be guilty of class C misdemeanor.
5. (1) Any person injured as a result of any violation or threatened violation of this section shall be entitled to injunctive relief against any and all violators or persons threatening violations.
(2) Any person injured as a result of any violation or threatened violation of this section may recover any and all damages of any character resulting from such violation or threatened violation including costs and reasonable attorney fees. Such remedies shall be independent of and in addition to the other penalties and remedies prescribed under this section.
6. The prosecuting attorney or circuit attorney with jurisdiction over the location where a violation or threatened violation of this section occurs or the attorney general of this state shall investigate complaints of violation or threatened violation of this section, prosecute any person violating this section, and use all means at their command to ensure the effective enforcement of this section.
7. This section shall not apply:
(1) To employers and employees covered by the federal Railway Labor Act;
(2) To federal employers and employees;
(3) To employers and employees on exclusive federal enclaves;
(4) Where this section conflicts with or is preempted by federal law; or
(5) To any agreement between an employer and a labor organization entered into before the effective date of this section but shall apply to any such agreement upon its renewal, extension, amendment, or modification in any respect after the effective date of this section.

There appear to be words missing in this phrase; presumably it was intended to read "as a condition of employment or continuation of employment," or something similar.

The circuit court's judgment ordered that "the Secretary of State shall immediately certify the corrected summary statement as part of the official ballot title." We stayed this aspect of the judgment in an order entered on July 3, 2017.

Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri.

The commonly understood meaning of a "summary" is "a short restatement of the main points (as of an argument) for easier remembering, for better understanding, or for showing the relation of the points: recapitulation , résumé , summation < proceeded to give a brief ~ of the points he had covered>." Webster's Third New Int'l Dictionary of the English Language 2289 (unabridged ed. 1993).

The Secretary's Brief states that the verbs "make" and "allow" "should be plural." The verbs should actually be stated in the singular form (although this requires adding a concluding "s" to each verb).

See also , e.g. , State ex rel. Klein v. Hughes , 351 Mo. 651, 173 S.W.2d 877, 880 (1943) ("the meaning of a statute may be plain though it contain mistakes in writing, grammar, spelling, punctuation, misnomers, misdescriptions, surplusage, or omit words"); State v. Schomers , 161 S.W. 1177, 1178 (Mo. App. 1913) (although acknowledging that a criminal charging instrument "was carelessly drawn and a close analysis shows faulty grammatical construction," holding that "it is not essential for an information to strictly and technically conform to the rules of grammar and rhetoric if it fully and sufficiently informs the defendant of the nature and cause of the accusation"); City of St. Louis v. Bircher , 7 Mo. App. 169, 170 (1879) ("When the meaning of an enactment is obvious, it cannot be defeated by criticisms on its inelegant phraseology.").

Evans argues that the summary statement could be read to ask:
Do the people of the state of Missouri want to
• adopt Senate Bill 19 ("Right-to-Work") as passed by the general assembly in 2017, which prohibits as a condition of employment the forced membership in a labor organization (union) or forced payments of dues in full or pro-rata (fair-share);
• make any activity which violates employees' rights illegal and ineffective;
• allow legal remedies for anyone injured as a result of another person violating or threatening to violate employees' rights;
• and which shall not apply to union agreements entered into before the effective date of Senate Bill 19?

The referendum mechanism is described in similar terms in the 1908 amendment which created the initiative and referendum by adding Article IV, § 57 to the 1875 Constitution. Article IV, § 57 provided in relevant part:
The legislature authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives, but the people reserve to themselves power to propose laws and amendments to the Constitution, and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly. The first power reserved by the people is the initiative.... The second power is the referendum.... Any measure referred to the people shall take effect and become the law when it is approved by a majority of the votes cast thereon, and not otherwise. The style of all bills shall be: "Be it enacted by the people of the State of Missouri."

As described in Toberman , the gathering of sufficient signatures to place a referendum question on the ballot has a similar effect to the Supreme Court's grant of transfer following a decision by the Court of Appeals. The grant of transfer vacates the Court of Appeals' decision; following the transfer grant, the Supreme Court decides the case "as on original appeal," without regard to the Court of Appeals' decision. Philmon v. Baum , 865 S.W.2d 771, 774 (Mo. App. W.D. 1993) ; see also Bolden v. State , 423 S.W.3d 803, 808 n.6 (Mo. App. E.D. 2013) (following Supreme Court's grant of transfer, decision of Court of Appeals " 'may be referred to as functus officio ,' meaning 'without further authority or legal competence' " (citation omitted)). In the same way, once a referendum petition has received sufficient signatures to be placed on the general election ballot, the referred measure is placed before the people for their consideration as an original proposition; the prior action by the General Assembly and the Governor on the referred measure is "suspend[ed] or annul[led]," and has no further legal effect or consequence.

Available at https://mospace.umsystem.edu/xmlui/bitstream/handle/10355/2524/% 20ConstitutionalAmendmentsStatutoryRevis?sequence=1&isAllowed=y (last visited July 24, 2017).

We need not decide whether a referendum question framed in the negative could be fair and sufficient; all we decide is that a referendum question worded affirmatively is not defective for that reason alone.

Caselaw recognizes the same possibility. See , e.g. , State ex inf. Ashcroft v. City of Fulton , 642 S.W.2d 617, 621 (Mo. banc 1982) (where "[t]here is no irreconcilable conflict" between two constitutional amendments addressing the same issues adopted by voters at the same general election, "both became part of the constitution"); Sayman v. Becker , 269 S.W. 973, 976 (Mo. banc 1924) (recognizing that initiative and referendum measures addressing worker's compensation issues appeared on the ballot simultaneously; "if both acts had received a majority at the election some court might have been confronted with an interesting question").

We also note that, beyond the ballot titles themselves, voters will have the benefit of a "fair ballot language statement" for every ballot measure, "which is posted in polling places next to the sample ballot, [and] must 'fairly and accurately explain what a vote for and what a vote against the measure represent.' " Brown , 370 S.W.3d at 646 n.6 (quoting § 116.025).

See , e.g. , Air Line Pilots Ass'n v. Miller , 523 U.S. 866, 868, 118 S.Ct. 1761, 140 L.Ed.2d 1070 (1998) ("An 'agency-shop' arrangement permits a union, obliged to act on behalf of all employees in the bargaining unit, to charge nonunion workers their fair share of the costs of the representation."); Int'l Ass'n of Firefighters v. Moon , 364 S.W.3d 647, 653 (Mo. App. W.D. 2012) (" 'Fair share' provisions do not compel or coerce union membership, but rather address the problem of free riders by requiring an employee to pay for a proportionate share of the benefits of the union's collective representation of the employees."); Schaffer v. Bd. of Educ. of City of St. Louis , 869 S.W.2d 163, 166 (Mo. App. E.D. 1993) ("The fair share arrangement compensates the union for providing, as required under its duty of fair representation, full and equal protection to all employees in the bargaining unit, regardless of union membership status.").

Ironically, the Stickler plaintiffs argue in their Brief that the term "fair share" "is certainly no less biased and value-laden than the term preferred by SB 19's advocates (and not advocated either here or in the Circuit Court): 'forced dues.' " The Stickler plaintiffs fail to acknowledge, however, that the phrase "forced payments of dues" does appear in the Secretary's summary statement.

The summary's use of the word "forced", and the phrase "Right-to-Work," has not been challenged in this case, and we express no opinion concerning the propriety of this language. We merely note that these other terms give important context to the term "fair share," which Respondents do challenge.

Given our disposition, and the stay of the circuit court's judgment which we entered on July 3, 2017, it is unnecessary for this Court to address Louis' second Point (which argues that the circuit court revised the summary statement more extensively than required to remedy the defects the court had identified), or his third Point (which argues that the circuit court erred by ordering the Secretary to "immediately certify" the court's revised summary statement).