

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| **MARY ANNE SEDEY,** | ) | |
| | ) | |
| **Appellant,** | ) | |
| **v.** | ) | **WD83356** |
| | ) | |
| | ) | **OPINION FILED:** |
| **MISSOURI SECRETARY OF STATE** | ) | **January 29, 2020** |
| **JOHN R. ASHCROFT,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**Appeal from the Circuit Court of Cole County, Missouri
The Honorable Daniel R. Green, Judge**

**Before Special Division:** Karen King Mitchell, Chief Judge, and
Lisa White Hardwick and Edward R. Ardini, Jr., Judges

Mary Anne Sedey appeals from a judgment entered in favor of Missouri Secretary of State

John R. Ashcroft on her petition for relief under § 116.190.1,[1] which allows "[a]ny citizen who

wishes to challenge the official ballot title . . . for a proposed constitutional amendment

submitted . . . by initiative petition . . . [to] bring an action in the circuit court of Cole County."

Sedey raises five points on appeal. Her first four points challenge the language in each of four

bullet points in Secretary Ashcroft's summary statements for the initiative petitions. Her final

---

[1] All statutory citations are to the Revised Statutes of Missouri, as updated through 2018.

point challenges the omission of information from the summary statements pertaining to two proposed amendments identified in the initiative petitions. We affirm in part and reverse in part.

## Background[2]

In June of 2019, Sedey submitted sixteen initiative petition sample sheets to Secretary Ashcroft for certification. All sixteen petitions proposed similar amendments to Article VIII of the Missouri Constitution, involving suffrage and elections. More specifically, each petition sought to amend Article VIII, §§ 5 (voter registration) and 7 (absentee voting), and add three new sections (§§ 24, 25, and 26), relating to military ballots, election audits, and provisional ballots, respectively. Half of the petitions also sought to add a fourth new section (§ 27), regarding pre-registration of individuals beginning at age 16. All petitions also sought to add a new section (§ 27 in those without pre-registration and § 28 in those with pre-registration) regarding severability of the provisions. Though there were minor variations among the petitions,[3] for purposes of this appeal, there were essentially two sets—those with the pre-registration provision and those without.

On July 31, 2019, Secretary Ashcroft certified official ballot titles for fourteen of the initiative petitions, and he certified ballot titles for the remaining two on August 5, 2019. Secretary Ashcroft assigned the following designations for Sedey's initiative petition sample sheets: 2020-072, 2020-073, 2020-074, 2020-075, 2020-076, 2020-077, 2020-078, 2020-079, 2020-080, 2020-081, 2020-082, 2020-083, 2020-088, 2020-089, 2020-097, and 2020-098.

---

[2] The case below was tried and submitted on stipulated facts and exhibits.

[3] The petitions differ in the following ways: (1) how the signature sheets require individuals to provide their names; (2) whether the Department of Corrections is expressly identified as an agency from which voter registration data is to be collected; and (3) whether extended early voting hours are required. As Sedey states in her brief, "These differences are immaterial to this appeal."

On August 9, 2019, Sedey filed a petition under § 116.190 in Cole County Circuit Court, arguing that the summary statements prepared by Secretary Ashcroft for the sixteen original initiative petitions were "intentionally argumentative, insufficient, and unfair."[4]

On October 21, 2019, the court held a bench trial on Sedey's petition, wherein it heard arguments and received the parties' stipulated facts and exhibits. Thereafter, the court issued its findings of fact, conclusions of law, and judgment, upholding Secretary Ashcroft's summary statements as fair and sufficient. Sedey appeals.

## Standard of Review

Sedey's petition was tried on stipulated facts and exhibits. "[W]hen there is no underlying factual dispute that would require deference to the trial court's factual findings," we apply "[d]e novo review [to] the trial court's legal conclusions about the propriety of the secretary of state's summary statement[s]." *Brown v. Carnahan*, 370 S.W.3d 637, 653 (Mo. banc 2012).

## Analysis

For each of the sixteen initiative petitions, Secretary Ashcroft certified a summary statement containing four bullet points. The summary statements varied slightly, depending entirely on whether the petition at issue included the Department of Corrections in the proposed amendment to Article VIII, § 5(3) and whether the petition at issue included the pre-registration provision as § 27. For ease of discussion, we will identify the applicable language of the relevant initiative petition and its corresponding summary statement bullet point as we address each of Sedey's points on appeal. But we begin with a brief background.

---

[4] On August 8, 2019, Sedey submitted several revised initiative petitions. On September 20, 2019, Secretary Ashcroft certified official ballot titles for the revised initiative petitions. Neither the revised initiative petitions nor their official ballot titles and summary statements are at issue in this appeal.

3

## I.   Judicial Review of Challenges to Summary Statements

Upon receipt of an initiative petition, the secretary of state reviews it and determines whether to approve its form. § 116.334.1. Within twenty-three days of that approval, the secretary of state must prepare a concise summary statement of the measure that does not exceed one hundred words. *Id.* "This statement shall be in the form of a question using language neither intentionally argumentative nor likely to create prejudice either for or against the proposed measure." *Id.*

When drafting summary statements, the secretary of state should use language that "fairly and impartially summariz[es] the purposes of the measure so that voters will not be deceived or misled." *Brown*, 370 S.W.3d at 654 (quoting *Mo. Mun. League v. Carnahan*, 364 S.W.3d 548, 552 (Mo. App. W.D. 2011). And the summary statement "should accurately reflect the legal and probable effects of the proposed amendment." *Billington v. Carnahan*, 380 S.W.3d 586, 592 (Mo. App. W.D. 2012) (quoting *Brown*, 370 S.W.3d at 654).

If a citizen wishes to challenge a summary statement, § 116.190 permits them to do so by identifying ways in which the challenged statement is either insufficient or unfair. *Id.* at 591; *see also Seay v. Jones*, 439 S.W.3d 881, 888 (Mo. App. W.D. 2014) ("When a party challenges the language of the summary statement, [t]he burden is on the opponents of the language to show that the language was insufficient and unfair." (quoting *Overfelt v. McCaskill*, 81 S.W.3d 732, 738 (Mo. App. W.D. 2002) (superseded in part by statutes)) (internal quotation omitted). "For purposes of § 116.190, '[i]nsufficient means inadequate; especially lacking adequate power, capacity, or competence.'" *Id.* (quoting *Cures Without Cloning v. Pund*, 259 S.W.3d 76, 81 (Mo. App. W.D. 2008)) (internal quotation omitted). And "unfair means to be marked by injustice,

4

partiality, or deception." *Id*. (quoting *Cures Without Cloning*, 259 S.W.3d at 81) (internal quotation omitted).

"When courts are called upon to intervene in the initiative process, they must act with restraint, trepidation, and a healthy suspicion of the partisan who would use the judiciary to prevent the initiative process from taking its course." *Cures Without Cloning*, 259 S.W.3d at 81 (quoting *Missourians to Protect the Initiative Process v. Blunt*, 799 S.W.2d 824, 827 (Mo. banc 1990)). "Courts are understandably reluctant to become involved in pre-election debates over initiative proposals. Courts do not sit in judgment on the wisdom or folly of proposals." *Id.* (quoting *Missourians to Protect the Initiative Process*, 799 S.W.2d at 827).

Missouri courts have defined "fair" and "sufficient" "in a manner that gives discretion to the Secretary." *Billington*, 380 S.W.3d at 591-92 (quoting *Brown*, 370 S.W.3d at 669 (Fischer, J., concurring)). The applicable question is not whether the summary drafted is the best summary, "but whether [it] gives the voter a sufficient idea of what the proposed amendment would accomplish, without language that is intentionally unfair or misleading. The idea is to advise the citizen what the proposal is about." *Id*. at 595. A finding of fairness and sufficiency is not dependent upon whether the secretary "could have more artfully phrased the summary," or "whether increased specificity and accuracy would be preferable." *Id*. Instead, "[t]he critical test is 'whether the language fairly and impartially summarizes the purposes of the measure so that voters will not be deceived or misled.'" *Cures Without Cloning*, 259 S.W.3d at 81 (quoting *Bergman v. Mills*, 988 S.W.2d 84, 92 (Mo. App. W.D. 1999)).

"[T]he appropriate inquiry involves both a review of the ballot summary to ensure that it does not use language that is intentionally argumentative and a comparison of the summary to the

5

provisions of the ballot measure to ensure that the summary fairly and adequately summarizes the proposed measure." *State ex rel. Kander v. Green*, 462 S.W.3d 844, 850 (Mo. App. W.D. 2015).

**II.     Secretary Ashcroft's summary statements regarding pre-registration are neither insufficient nor unfair.**

In her first point on appeal, Sedey argues that Secretary Ashcroft's summary statements with respect to the pre-registration provision of the initiative petitions are insufficient and unfair insofar as they incorrectly and misleadingly state that the petition will "register" sixteen- and seventeen-year-old individuals to vote, thereby misstating the effect of a "yes" vote.

The pre-registration provision of the initiative petitions states as follows:

Section 27.  An individual who is at least 16 years old and otherwise meets all eligibility requirements to vote shall be pre-registered to vote as provided herein.

> (1) Such individuals shall be pre-registered pursuant to the registration process in Section 5 of this Article; or

> (2) Such individuals may choose to register pursuant to any other registration procedure available under general election law.

2.  Such individuals are prohibited from casting a ballot until they meet all voter eligibility requirements.

Secretary Ashcroft summarized this portion of the initiative petitions as follows:

Do you want to amend the Missouri Constitution to:

- establish automatic voter registration of individuals at least 16 years old from state agency lists (including the departments of revenue, social services and conservation) . . . ?[5]

Sedey argues that the summary improperly combines the pre-registration provision from proposed § 27 with the proposed changes to § 5 establishing automatic voter registration, resulting in a summary that would mislead voters into believing that the proposed amendment would change

---

[5] Some versions of the summary, like some versions of the initiative petitions, also included the department of corrections.

voter qualifications by lowering the eligible voting age to 16. The trial court disagreed, finding "that there is no meaningful difference between the phrases 'pre-registration' and 'registration' based on the plain text and practical consequences of the proposed initiatives." The trial court further noted that "there is a distinction between 'registered to vote' and 'eligibility to vote,'" and "[n]othing in the Secretary's summary statement suggests that individuals as young as 16 are eligible to vote."

Sedey relies on §§ 115.135 and 115.137 to support her argument that there is a meaningful distinction between pre-registration and registration and that the current summaries are likely to mislead voters. Section 115.135.1 provides, in pertinent part, "Any person who is qualified to vote . . . shall be entitled to register in the jurisdiction within which he or she resides." § 115.135.1. Section 115.137.1 provides, in pertinent part, that "any citizen who is entitled to register and vote shall be entitled to register for and vote pursuant to the provisions of this chapter in all statewide public elections and all public elections held for districts and political subdivisions within which he resides." § 115.137.1. Sedey suggests these statutes mean that, "[u]nder Missouri law, those who are registered to vote can in fact vote." Therefore, Sedey argues, by suggesting that the proposed amendment would automatically register (rather than pre-register) sixteen-year-olds to vote, it misleads voters to believe that the proposed amendment would lower the eligible voting age—a change it plainly would not make. We disagree.

Sedey's argument misreads the statutes she relies upon. While those statutes indicate that all who are qualified to vote are also entitled to register and to vote, it does not support Sedey's inverse interpretation that all who are registered to vote are also eligible to vote. In fact, as the trial court pointed out, § 115.133.1 currently allows individuals age 17 and one-half years old to register, despite not being otherwise eligible to vote. Though Secretary Ashcroft's choice to

7

combine the automatic voter registration provision with the pre-registration provision may not have been ideal, we cannot say that it is either insufficient or unfair. Accordingly, Point I is denied.[6]

### III. Secretary Ashcroft's summary statements regarding provisional ballots are unfair insofar as they misrepresent the legal and probable effects of the proposed amendments.

In her second point on appeal, Sedey argues that Secretary Ashcroft's summary statements regarding provisional ballots are unfair and insufficient insofar as the use of the word "wrong" is intentionally argumentative, misleading, and likely to prejudice voters, and the summary statements incorrectly suggest that election judges will "transfer" votes between ballots, though nothing in the proposed amendments supports that assertion.

The initiative petitions propose a new § 26 for Article VIII, which provides as follows:

Section 26. Notwithstanding any other provision of law to the contrary, the provisional ballot, regardless of type, of a voter who is otherwise entitled to vote shall be accepted as long as the precinct at which the voter cast a ballot is within the jurisdiction of the same local election authority as the precinct to which the voter was assigned by an elections official. Provisional ballots, regardless of type, shall be counted as provided herein.

   (1)    If the provisional ballot cast by the voter contains the same candidates and measures on which the voter would have been entitled to vote in his or her assigned precinct, the ballot shall be counted.

---

[6] In the argument portion of her brief on this point, Sedey argues that Secretary Ashcroft's revised summary statements issued in response to Sedey's submission of revised initiative petitions somehow reflect an acknowledgement by Secretary Ashcroft that the original language was unfair and insufficient. We disagree. It is unclear why Sedey believes the revised language, written in response to revised petitions, is relevant in any way. To begin, it is wholly expected that revised petition language would lead to revised summary language and, thus, does not in any way reflect upon the fairness or sufficiency of the original summary language. Second, accepting Sedey's argument would effectively deter the secretary of state from making improvements or revisions to existing summary statement language, and that seems an undesirable outcome. *C.f., Emerson v. Garvin Grp., LLC*, 399 S.W.3d 42, 44 (Mo. App. E.D. 2013) (noting that the bar on admission of evidence of subsequent remedial measures in tort cases is rooted in "the fear that if safety improvements could be used as evidence of previous improper conditions, no one, after an accident, would make improvements."). Finally, the secretary's intent in choosing language for summary statements is wholly irrelevant, so the secretary's intent regarding any revision of language seems equally irrelevant. *See State ex rel. Kander v. Green*, 462 S.W.3d 844, 852 (Mo. App. W.D. 2015) ("[I]t is clear that the Secretary's . . . views as they relate to [i]nitiative [p]etition[s] . . . —whether he is its staunchest advocate or most vociferous opponent—have no relevance to the question at issue: whether the Secretary's ballot summary is insufficient or unfair.").

(2)     If the provisional ballot cast by the voter contains candidates or measures on which the voter would not have been entitled to vote in his or her assigned precinct, the elections official shall count only the votes for the candidates and measures on which the voter was entitled to vote in his or her assigned precinct.

The summary statements, in their second bullet point, stated,

Do you want to amend the Missouri Constitution to:

. . .

- allow voters on election day to appear at the wrong polling place, vote on a wrong ballot, and have election judges later transfer the votes to the right ballot . . . ?

The trial court rejected Sedey's arguments, first finding that the "use of the word 'wrong' is simply an antonym of the word, 'correct,' which Missouri election law currently uses regarding a voter's obligation on election day." Thus, the court held, the word "wrong" is not intentionally argumentative. And, second, the court found that, because "Missouri law does not require each precinct to have the ballots for other precincts," the only way to properly count the provisional ballots would be to have local election judges transfer the votes to the "correct" ballot.

With respect to the use of the word "wrong," Sedey argues that "[t]he word 'wrong' has a distasteful connotation," and that "[s]ome voters may interpret 'wrong' to mean 'incorrect,' while others may interpret it to mean 'not in accordance with justice, law, morality, etc.; unlawful, immoral, or improper' or 'not suitable or appropriate.'" (App. Br. 22) (quoting *Webster's New World College Dictionary* at 1672 (5th ed. 2014)). She further argues that the ballots to be counted are provisional, and provisional ballots are not "wrong."

Even if Sedey is correct that the word "wrong" has a distasteful connotation, the mere use of a value-laden term does not necessarily render a summary statement unfairly biased or partial. *Stickler v. Ashcroft*, 539 S.W.3d 702, 718 (Mo. App. W.D. 2017). We must still look at "the

9

overall language of the summary statement, and the context in which the [value-laden] words . . . appear." *Id*.

Here, the context surrounding the use of the word "wrong" suggests that it is being used in the sense of "not right" or "incorrect."[7] We find it highly unlikely that the average voter will attribute immorality or intentional lawlessness to the voter who has appeared at a polling place other than the one assigned, especially given that the summary statements also indicate that votes cast on "wrong" ballots at the "wrong" polling place will be transferred to the correct ballot, presumably so that they may be counted. The fact that the votes will still be counted recognizes that such conduct is most likely attributable to a mistake, inadvertence, or negligence, and that none of those should negate the voter's effort to participate in the democratic process. And, as for her argument that the ballots are provisional, and provisional ballots are not "wrong," all that needs to be said is that the ballots at issue become provisional precisely because they are either not the ballots the voter should have used or were cast at a polling place where the voter was not assigned. In other words, they are provisional only because, when cast, they are in some manner "wrong."

Sedey's second argument on this point is that the summary statements blatantly misrepresent what happens when a voter casts a "wrong" ballot by asserting that election judges would later transfer the votes to the correct ballot. The proposed amendment indicates only that ballots cast at an unassigned polling place on the ballot applicable to that precinct shall be counted to the extent the issues and candidates on the ballot cast align with those on the ballot provided at the voter's assigned polling place. As Sedey indicates, nothing in the proposed amendment suggests that election judges would be transferring votes in any way.

---

[7] Sedey takes issue with the word "incorrect" as an alternative to "wrong," noting that it would still be problematic, though "substantially more neutral and less sensational."

The trial court, in rejecting this challenge, noted that "nothing in Missouri law would presumably prevent local election judges from transferring votes to the 'correct' ballot." It further noted that "Missouri law, in fact, currently has limited mechanisms in place where local election judges can perform this transferring process, such as in the case of damaged ballots." Under 15 C.S.R. § 30-9.010(3)(C), "If a ballot is determined to be damaged, the bipartisan team shall spoil the original ballot and duplicate the voter's intent on the new ballot, provided that there is an undisputed method of matching the duplicate card with its original after it has been placed with the remainder of the ballot cards from that precinct." The trial court relied on 15 C.S.R. § 30-10.060(2)(B), which provides:

> (B) Ballot duplication for damaged ballots shall be done by bipartisan teams using whatever method is selected by the election authority provided that—
>
> 1. The system provides an exact duplicate of the voter's intent, pursuant to 15 CSR 30-9.010, 15 CSR 30-9.020 and 15 CSR 30-9.030;
>
> 2. Both members of the team participate in the process;
>
> 3. Both members can review the other's work;
>
> 4. There is an undisputed method to match the duplicate card with its original after it has been placed with the remainder of the ballot cards from that precinct; and
>
> 5. Allowances are made for watchers appointed pursuant to section 115.107, RSMo to perform their statutory duties.

Sedey contends that the summary statements' suggestion that votes would be transferred is not only inaccurate and misleading but also unfairly prejudicial insofar as it implies that "election authorities will physically fill out new ballots, potentially introducing new errors or inviting election fraud."

While nothing in the proposed amendments suggests that votes will be physically transferred, it is equally true that nothing in the proposed amendments indicates *how* the

11

provisional ballots are to be counted. It may very well be that, should the proposed amendments be adopted, election judges will physically transfer ballots in the same manner as they do with damaged ballots, which, under the regulations, is a bipartisan process designed to eliminate the possibility of vote tampering or election fraud. But, at this point, it is premature for Secretary Ashcroft to suggest to voters a process that is not provided for by the proposed amendments, as we do not yet know if the process will be the same. And, because some voters may be prejudiced against the proposed amendments due to a potentially errant belief that, without statutory or regulatory guidance, election judges will be transferring votes, the vote-transfer language of the summary statements is unfair and must be redrafted. To avoid the unfairness generated by the errant language, the second bullet point of the summary statements should be redrafted as follows:

- allow voters appearing at the wrong polling place, to vote on a wrong ballot, and have their votes counted on candidates and measures for which the voter was otherwise entitled to vote . . . ?[8]

Point II is granted in part and denied in part.

## IV. Secretary Ashcroft's summary statements regarding absentee voting are fair and sufficient.

In her third point on appeal, Sedey argues that Secretary Ashcroft's summaries regarding the absentee voting provisions are unfair and insufficient insofar as they fail to summarize the central feature of the proposed amendments—to create a no-fault absentee voting system.

The initiative petitions propose amending Article VIII, § 7, in pertinent part as follows:[9]

Section 7. All qualified [electors] voters of the state [who are absent, whether within or without the state,] may [be enabled by general law to] vote by absentee ballot without providing a reason at all elections by the people either in person or by mail starting forty-two days before an election. For the purposes of this section, the early voting period shall be the period when eligible voters may cast an absentee

---

[8] The first portion of this bullet point has been slightly altered simply to fit within the 100-word limit. The substance remains the same as Secretary Ashcroft's original summary statements.

[9] Additions are underlined, and deletions are bracketed.

12

ballot in person.  Procedures for voting by absentee ballot shall be the same as provided in general election law, as provided herein.

(1) Voters who choose to vote by absentee ballot shall have the option to receive the absentee ballot in the mail or to vote in person using an absentee ballot during the early voting period.  Voters who receive an absentee ballot in the mail shall be allowed to return their completed ballot and envelope by mail, or by dropping it off at any officially designated voting location during the early voting period or on election day.  The local election authority may also provide additional options for returning or casting absentee ballots.  Nothing in this section shall be construed to prevent a person who has received a ballot in the mail but has not returned a completed ballot from casting a regular or provisional ballot in person during the early voting period or on election day.

. . .

(3) Local election authorities may make absentee ballots available for voting in person during the early voting period at additional times and places beyond what is designated in subsection (2).

. . .

(5) All qualified voters of the state shall be provided the opportunity to request to permanently receive mail-in absentee ballots in the mail for all future elections.  An opportunity to sign up to permanently receive absentee ballots shall be provided, at a minimum, on the application for voter registration, via electronic means, and on the application to receive a mail-in absentee ballot.

Secretary Ashcroft summarized the proposed amendments to § 7 in the third and fourth bullet points of the summary statements.  At issue in Sedey's third point on appeal is the third bullet point, which states as follows:

Do you want to amend the Missouri Constitution to:

. . .

- allow voters to sign up to permanently vote by mail, with voting by mail allowed during the six weeks before each election . . . ?

The trial court found "that this is an accurate summary that addresses one of the initiative petitions' central features[,] . . . and it includes at least two aspects of what those changes will include:  permanently voting by mail, and allowing voting by mail during the 6-week time period

13

before an election." The trial court concluded that the "summary statement focuses on what the measure would change the most from current law."

Sedey argues that, contrary to the trial court's determination, "the most substantial alteration [the proposed amendments] would make to the existing absentee voting rules is to allow voters to vote by absentee ballot ***without providing a reason*** (i.e., transitioning Missouri to a no-fault absentee voting system)." Therefore, she concludes, "it is the most prominent aspect of the proposed revisions to Section 7."[10]

"The summary statement should inform voters of the 'central feature[s]' of the initiative or referendum proposal." *Stickler*, 539 S.W.3d at 709 (quoting *Boeving v. Kander*, 493 S.W.3d 865, 875 (Mo. App. W.D. 2016)). "At the same time, '[t]he summary statement need not set out the details of the proposal to be fair and sufficient." *Id*. (quoting *Brown*, 370 S.W.3d at 656). In other words, while a summary statement need not "set out the details of the proposal or resolve every peripheral question related to it," *Mo. Mun. League v. Carnahan*, 303 S.W.3d 573, 586 (Mo. App. W.D. 2010), it must "make[] the subject evident with sufficient clearness to give notice of the purpose to those interested or affected by the proposal." *United Gamefowl Breeders Ass'n of Mo. v. Nixon*, 19 S.W.3d 137, 140 (Mo. banc 2000). The omission of proposed changes from the summary statement will not render the ballot summary insufficient if they are not central features of the proposed amendment. *Dotson v. Kander*, 464 S.W.3d 190, 196 (Mo. banc 2015). Thus, the question before us is two-fold: (1) is the no-fault absentee voting provision a central feature? And

---

[10] Sedey also challenges the summary statements' omission of any reference to the proposed amendments allowing for in-person absentee voting. She argues that, because in-person absentee voting is currently permitted by statute, the summary statements' omission of any reference to in-person absentee voting implies that the proposed amendments would take away the existing right to in-person absentee voting and is thereby misleading. We disagree. There is no indication in the summary statements that any existing rights will be removed. "While there may be specific aspects of the ballot measure that [Sedey] would like to see included in the summary statement, their exclusion does not render the summary statement insufficient or unfair." *Coburn v. Mayer*, 368 S.W.3d 320, 326 (Mo. App. W.D. 2012).

14

(2) if so, does its absence render the summary statements insufficient?  Though we agree with Sedey that the no-fault absentee voting provision *is* a central feature, we disagree that the absence of an express reference to that feature renders the summary statements insufficient.

What constitutes a "central feature" of a proposed amendment has not been directly addressed in any cases we could find.  But many cases directly state that summary statements are designed to identify for voters the *purpose* of proposed changes.  *See Brown*, 370 S.W.3d at 654 (noting that the language used "should fairly and impartially summarize the purposes of the measure" (quoting *Mo. Mun. League*, 364 S.W.3d at 552)); *Billington*, 380 S.W.3d at 592 (same); *Buchanan v. Kirkpatrick*, 615 S.W.2d 6, 13 (Mo. banc 1981) (identifying the "central purpose" of a proposed amendment); *Hill v. Ashcroft*, 526 S.W.3d 299, 308, 314 (Mo. App. W.D. 2017) (noting that summary statements should make voters aware of "the subject and purpose of the initiative"); *Stickler*, 539 S.W.3d at 710 (noting that summary statements must include referendum's "central purpose and effects"); *Mid-State Distrib. Co. v. City of Columbia*, 617 S.W.2d 419, 423 (Mo. App. W.D. 1981) (noting that summary statements "must give a true and impartial statement of the purpose of the measure").

Determining the purpose of a proposed amendment may be done in several ways.  It may be that the purpose is evident from either a ballot or petition title.  *Buchanan*, 615 S.W.2d at 13.  Or, where the purpose is not evident, courts may consider what issue the proposed amendment is designed to address,[11] "what the proposed amendment would accomplish,"[12] or its "primary objective[s]."[13]

---

[11] *See Hudson v. Dir. of Revenue*, 216 S.W.3d 216, 221 (Mo. App. W.D. 2007) (identifying how courts are to discern legislative intent of statutes).

[12] *Billington*, 380 S.W.3d at 595.

[13] *Seay*, 439 S.W.3d at 889.

15

Here, the summary statements serve as the official ballot title for the initiative petitions, and none of the exhibits submitted below indicate any particular title affixed to the petitions themselves. As such, the purpose is not evident from a title as in *Buchanan*. In the proposed changes to Section 5, the initiative petitions suggest that, if adopted, "[a]ll laws governing registration shall be interpreted liberally to ensure, to the extent possible, that all eligible citizens be allowed to register to vote and to vote." While this language seems to speak to purpose, it actually addresses how the measure should be interpreted if it were adopted. As such, this language is not the sort of clear expression of purpose on which we can rely at this point in the process.

In looking at what the proposed amendment would accomplish (with respect to § 7, specifically), if adopted, it would significantly broaden the scope of absentee voting in Missouri in three specific ways. It would eliminate the need to provide a reason for voting by absentee ballot,[14] it would allow any voter to cast a ballot by mail or in person starting forty-two days before an election is held,[15] and it would create an option for *all* qualified voters to request permanent receipt of mail-in absentee ballots for future elections.[16]

In short, the proposed amendments to Article VIII, § 7, vastly expand eligibility for absentee voting to cover all eligible voters in Missouri and not just those falling into the six specific categories identified in § 115.277.1. As such, the no-fault absentee voting provision is a central feature.

That said, the absence of any express reference to the no-fault provision does not necessarily render the summary statements insufficient. The summary statements, though not

---

[14] Under § 115.277.1, those currently wishing to vote absentee must identify one of six reasons for voting absentee, rather than in-person on election day.

[15] Under §§ 115.275(1) and 115.277.1, currently, only those who are entitled to vote absentee may vote away from a polling place in the six weeks preceding an election.

[16] Under current law, permanent receipt of mail-in absentee ballots is available for only those with permanent disabilities. § 115.284.

16

specifically indicating that the proposed amendments would allow for no-fault absentee voting, are stated very broadly, identifying their application to the *unqualified* term, "voters." The summary statements indicate that the proposed amendments would "allow voters to sign up to permanently vote by mail, with voting by mail allowed during the six weeks before each election." There is no qualification on "voters," suggesting its applicability to *all* voters. If all voters will be permitted to vote by mail, then the limits imposed on absentee voting by § 115.277 would no longer apply. "[T]he use of broad, over-inclusive language is acceptable and does not run contrary to the requirements that the summary be 'a concise statement . . . using language neither intentionally argumentative nor likely to create prejudice either for or against the proposed measure." *Hill*, 526 S.W.3d at 308 (quoting § 116.334.1). Accordingly, though the no-fault absentee voting provision is a central feature, the absence of an express reference to the proposed provision does not render the summary statements insufficient in light of the fact that they are written broadly enough to encompass this proposed change.

Point III is denied.

## V. Secretary Ashcroft's summary statements regarding absentee voter lists inaccurately represent the legal and probable effects of the proposed amendments.

In her fourth point, Sedey argues that Secretary Ashcroft's summary statements regarding absentee voter lists are unfair and insufficient insofar as they inaccurately represent the legal and probable effects of the proposed provision by stating the proposal will "make" information about voters' methods of voting public when it will not do so. She further argues that the summary statements errantly suggest that the central purpose of the proposal is to identify the precise type of absentee ballot a voter uses.

This point is directed at the following portion of the proposed amendments to Article VIII, § 7:

> (8) The secretary of state and all local election authorities shall make available a list of all voters who cast ballots under this section or Article VIII, section 24 of this Constitution. Such list shall include voter information that is a matter of public record. This list shall be provided in the same manner required by general election law.

And it focuses on the fourth bullet point of Secretary Ashcroft's summary statements, which says:

> Do you want to amend the Missouri Constitution to:
>
> . . .
>
> • make voters' method of voting a public record (mail, in person or military)?

The trial court determined that Secretary Ashcroft's summary statements "identified one of the central features of the initiatives and summarized it in a fair and sufficient way such that voters are on notice of the initiative[s'] content and can look to the initiatives' full text upon further investigation." The trial court noted that the initiative petitions indicate "that the Secretary shall provide a list [of] who cast ballots 'under [Article VIII, section 7] or Article VIII, section 24' of the Constitution," which all "address methods of voting, including voting by mail, voting in person, and military voting." Therefore, the court reasoned, "[b]ecause the list itself is comprised of voters who vote by a specific method, the list therefore effectively makes voters' method of voting a public record."

Sedey contends that Secretary Ashcroft's summary statements inaccurately represent the legal and probable effects of the proposed amendments insofar as they suggest that the proposed amendments would make voters' *method of voting* a public record. Sedey further contends that, while subsection (8) "might be of interest to the Secretary's office, it likely isn't terribly interesting to anyone else" and "certainly isn't one of the . . . central features" of the proposed amendments,

18

and should, therefore, be stricken from the summary statements. While we agree with Sedey that the summary statements misrepresent the legal and probable effects of the proposed amendments, we decline her invitation to simply strike this portion of the summary statements.

Taking Sedey's arguments in reverse, while the summary statements "should inform voters of the 'central feature[s]' of the initiative or referendum proposal," and "need not set out the details of the proposal," *Stickler*, 539 S.W.3d at 709, nothing precludes the summary statements from including such details.[17] As such, we need not decide whether the bullet points at issue in this point on appeal involve a central feature of the proposed amendments or merely details. Sedey's true complaint is that she believes the summary statements failed to make the best use of the limited space by including some information she deems uninteresting details and excluding other information she deems central features. But the test is not whether the summary statements are "the best utilization of the allotted space." *Bergman*, 988 S.W.2d at 92. The test is whether the language used is, itself, insufficient and unfair. *Id.* Merely including information that the proponent of the initiative petitions deems not to be "terribly interesting" does not render the language used insufficient or unfair.

As to Sedey's first argument—that the summary statements misrepresent the legal and probable effects of the proposed amendments, we agree. The proposed amendments would require the secretary of state and all local election officials to generate a list of all voters casting ballots under Article VIII, §§ 7 and 24. Though these ballots encompass *all* absentee voting—whether it be by mail, in-person, or military—contrary to the assertion in the summary statements, nothing in the proposed amendments requires the particular *method* of absentee voting (by mail, in-person,

---

[17] We recognize that this court has previously indicated that summary statements "ought not to be clouded by undue detail." *Mid-State Distrib. Co. v. City of Columbia*, 617 S.W.2d 419, 423 (Mo. App. W.D. 1981). But neither *Mid-State* nor any other cases cited by the parties have stricken portions of summary statements solely for including unnecessary detail. We decline to do so here.

19

or military) to be included in the lists. Inclusion of this inaccurate assertion in the summary statements may prejudice some voters against the proposed amendments if the voters are opposed to their method of voting becoming public information. Therefore, the inclusion of this inaccurate information renders Secretary Ashcroft's summary statements unfair, and, as a result, this bullet point must be redrafted. To avoid unfairness, the fourth bullet point of the summary statements should state:

- make available, using public records, a list of all voters casting absentee ballots?

Point IV is granted in part and denied in part.

## VI. Secretary Ashcroft's omission of information pertaining to proposed §§ 24 and 25 did not render the summary statements insufficient.

In her final point on appeal, Sedey argues that the summary statements are insufficient insofar as they fail to summarize provisions regarding the acceptance of military ballots and the auditing of election returns, which she identifies as central features of the proposed amendments. She argues that the summary statements instead focus on irrelevant details, such as which of various state agencies will be responsible for compiling information.[18]

The initiative petitions included proposed amendments adding §§ 24 and 25 to Article VIII. Those sections would state:

Section 24. An absentee ballot of an overseas or uniformed services voter, as defined by general election law, shall be counted by the local election authority so long as the ballot is dated on or before election day and received by the local election authority within seven days of election day.

Section 25. The secretary of state in conjunction with the state auditor shall provide a recommendation to local election authorities for the best method to conduct a risk-limiting audit of election returns. Each local election authority shall adopt a method of risk-limiting audit for auditing election returns.

---

[18] This argument is directed at information included in Secretary Ashcroft's first bullet point of the summary statements identifying the agencies responsible for compiling lists for automatic voter registration.

20

None of Secretary Ashcroft's summary statements specifically addressed these proposed amendments to Article VIII. The trial court found that neither of these proposed amendments were central features of the initiative petitions because neither involved any significant change in the law and, therefore, their absence did not render the summary statements deficient. We agree.

As discussed above, whether a provision is a central feature of an initiative petition is determined by the overall purpose(s) of the proposed amendments. The purpose of proposed § 24 is to expand the timeline in which valid military or overseas ballots may be counted by approximately four days.[19] This is a minimal change, unlike the more significant changes created by the drastic expansion of absentee voting rights in § 7. Thus, it does not appear to constitute a central feature of the initiative petitions.

The primary purpose of proposed § 25 is to identify the "best method" for conducting a "risk-limiting audit" of election returns. But the initiative petitions do not identify or define what is meant by a "risk-limiting audit," or how it differs from what Missouri law currently provides in a post-election auditing process under 15 C.S.R. § 30-10.110. Accordingly, it is unclear what, if anything, would be accomplished by the addition of proposed § 25. Therefore, it cannot be deemed a central feature of the initiative petitions.

Because neither proposed § 24 nor proposed § 25 appears to be a central feature of the initiative petitions, the absence of those sections does not render the summary statements insufficient.

Point V is denied.

---

[19] Under § 115.920.1, such ballots may be counted if received "before noon on the Friday after election day." Proposed § 24 expands the timeline to "seven days of election day."

21

**Conclusion**

The trial court did not err in finding that the summary statements, with respect to the first and third bullet points were fair and sufficient. The trial court did err, however, in finding that the second and fourth bullet points of Secretary Ashcroft's summary statements were fair and sufficient in all respects. Both bullet points contained misrepresentations of the legal and probable effects of the proposed amendments, such that they might prejudice voters against the proposals, rendering them unfair. Pursuant to Rule 84.14, we enter the judgment the circuit court ought to have given; the second and fourth bullet points for the summary statements, which shall appear on the ballot, if the other legal prerequisites to placing them on the ballot are met, shall read as follows:[20]

Shall the Missouri Constitution be amended to:

. . .

- allow voters appearing at the wrong polling place, to vote on a wrong ballot, and have their votes counted on candidates and measures for which the voter is otherwise entitled to vote;

. . .

- make available, using public records, a list of all voters casting absentee ballots?

Sedey's first, third, and fifth points on appeal are denied. Sedey's second and fourth points on appeal are granted in part and denied in part, consistent with the opinion above. The matter is affirmed in part and reversed in part, and judgment is given by this court pursuant to Rule 84.14 as set forth herein.

---

[20] The opening language has been changed simply to satisfy the 100-word limit. The substance remains the same.

22

**Addendum**

A complete version of the summary statements should appear as follows:[21]

Shall the Missouri Constitution be amended to:

- establish automatic voter registration of individuals at least 16 years old from state agency lists (including the departments of revenue, social services, corrections, and conservation);

- allow voters appearing at the wrong polling place, to vote on a wrong ballot, and have their votes counted on candidates and measures for which the voter was otherwise entitled to vote;

- allow voters to sign up to permanently vote by mail, with voting by mail allowed during the six weeks before each election; and

- make available, using public records, a list of voters casting absentee ballots?

_____
Karen King Mitchell, Chief Judge

Lisa White Hardwick and Edward R. Ardini, Jr., Judges, concur.

---

[21] This version represents the summary statements for those initiative petitions that include the department of corrections in the first bullet point. For those that do not include the department of corrections, the word "corrections" should be omitted, consistent with the original versions.