

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| BARBARA PIPPENS, JOHN BOHNEY, CHERYL HIBBELER, REBECCA SHAW, BOB MINOR, JAMES HARMON, GENE DAVISON, and PAT McBRIDE, Respondents, | ) ) ) ) ) ) ) | |
| v. | ) ) | WD83962 |
| JOHN R. ASHCROFT, in his official capacity as Missouri Secretary of State, DAVE SCHATZ, in his official capacity as State Senator and President Pro Tem of the Senate, ELIJAH HAAHR, in his official capacity as State Representative and Speaker of the House, and DANIEL HEGEMAN, in his official capacity as State Senator and sponsor of Senate Resolution 38, Appellants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | FILED: August 31, 2020 |

Appeal from the Circuit Court of Cole County
The Honorable Patricia S. Joyce, Judge

Before Special Division:  Lisa White Hardwick, P.J., and
Alok Ahuja and Karen King Mitchell, JJ.

In its 2020 regular session the General Assembly passed Senate Joint

Resolution 38 ("SJR 38"), which proposes amendments to the Missouri Constitution

concerning legislative redistricting, campaign contribution limits, and lobbyist gifts.

The measure will appear on the November 3, 2020 general election ballot as Amendment No. 3.

A group of eight Missouri citizens (the "Challengers") filed suit against the Secretary of State and other State officials in the Circuit Court of Cole County to challenge the official summary statement for SJR 38. The circuit court agreed with the Challengers that each of the three bullet points in the official summary statement was unfair and insufficient; the court accordingly rewrote the summary statement, and certified to the Secretary of State an alternative statement for inclusion on the ballot.

The Secretary of State and the other defendants appeal. We affirm in part and reverse in part. While we agree with the circuit court that certain aspects of the official summary statement are unfair or insufficient and require revision, we certify to the Secretary of State an alternative summary statement which makes more limited revisions than those ordered by the circuit court.

**Factual Background**

In the general election held on November 6, 2018, Missouri voters approved Constitutional Amendment No. 1, which had been proposed by initiative petition. Amendment No. 1 made multiple revisions to Article III of the Missouri Constitution, the article establishing the legislative department.

We rejected pre-election challenges to the validity of Amendment No. 1 in *Ritter v. Ashcroft*, 561 S.W.3d 74 (Mo. App. W.D. 2018). *Ritter* explained that Amendment No. 1 "prohibit[s] legislators and legislative employees from accepting gifts valued at more than $5.00 from paid lobbyists," and "prohibit[s] candidates for the Senate from accepting campaign contributions of more than $2,500.00 in any one election cycle, and prohibit[s] House candidates from accepting contributions of more than $2,000.00." *Id.* at 80; *see* Mo. Const. Art. III, § 2(b), (c).

2

In addition, we explained that Amendment No. 1 "substantially modif[ies] the procedure for apportioning House and Senate Districts following a decennial census." *Ritter*, 561 S.W.3d at 80. As we described in *Ritter*,

[Amendment No. 1] establish[es] a new position known as the "non-partisan state demographer," to be selected through an application process overseen by the State Auditor, and with the participation of the majority and minority leaders of the Senate. [*See* Mo. Const. Art. III, § 3(a), (b).] The non-partisan state demographer is charged with preparing proposed legislative re-districting plans and maps following the decennial census. [*Id.* §§ 3(c), 7(a)]. In preparing those redistricting proposals, the demographer is charged with giving the districts "a total population as nearly equal as practicable to the ideal population for such districts," and with complying with the requirements of the United States Constitution and federal laws, including the Voting Rights Act of 1965. [*Id.* § 3(c)(1)a, b.] The demographer is also directed that

> Districts shall be designed in a manner that achieves both partisan fairness and, secondarily, competitiveness. Partisan fairness means that parties shall be able to translate their popular support into legislative representation with approximately equal efficiency. Competitiveness means that parties' legislative representation shall be substantially and similarly responsive to shifts in the electorate's preferences.

[*Id.* § 3(c)]. [Amendment No. 1] also directs the demographer to consider geographic contiguity, the boundaries of existing political subdivisions, and the compactness of the proposed districts. These considerations, however, are expressly subordinated to consideration of equal population, compliance with federal law, and partisan fairness and competitiveness. [*Id.* § 3(c)(1)c, d, e.]

[Amendment No. 1] provide[s] that, within six months following the release of the decennial census results, the non-partisan state demographer shall file with the Secretary of State "a tentative plan of apportionment and map of the proposed districts, as well as all demographic and partisan data used in the creation of the plan and map." [*Id.* § 3(c)(3).] [Amendment No. 1] largely retains the procedure found in the current Missouri Constitution for the Governor to select House and Senate reapportionment commissions with . . . input [from the two major political parties]. [*See id.* § 3(c)(2).] Under [Amendment No. 1], the reapportionment commissions are charged with holding at least three public hearings concerning the demographer's proposed apportionment plan. [*Id.* §§ 3(c)(3), 7(c).] The commissions may make

modifications to the demographer's proposed plan and map, but only
"by a vote of at least seven-tenths of the commissioners." [*Id.*]
[Amendment No. 1] provides that, "[i]f no changes are made or
approved as provided for in this subsection, the tentative plan of
apportionment and map of proposed districts shall become final." [*Id.*]

*Ritter*, 561 S.W.3d at 80-81.

Amendment No. 1's creation of the post of Nonpartisan State Demographer
was mentioned by the Supreme Court of the United States in its decision finding
that partisan gerrymandering of State legislative districts does not present a
justiciable controversy under federal law. *Rucho v. Common Cause*, 139 S. Ct. 2484
(2019). The Court observed that, while federal law provided no remedy, "[t]he
States . . . are actively addressing the issue [of partisan influence over redistricting]
on a number of fronts." *Id.* at 2507. After noting that a number of States had
established independent redistricting commissions, the Court stated that "Missouri
is trying a different tack. Voters there overwhelmingly approved the creation of a
new position – state demographer – to draw state legislative district lines." *Id.*
(citing Mo. Const. Art. III, § 3). The introduction of "partisan fairness" and
"competitiveness" criteria, and their placement in the highest-priority category, is
also an apparently novel feature of the new redistricting process put in place by
Amendment No. 1.[1]

In its 2020 regular session, the General Assembly passed Senate Substitute
No. 3 for Senate Joint Resolution No. 38 ("SJR 38"). SJR 38 submits to voters a
proposed constitutional amendment which would modify the features of
Amendment No. 1 described above. While Amendment No. 1 prohibits legislators
and their staffs from accepting gifts from paid lobbyists with a value in excess of

---

[1]     *See* David Gartner, _Arizona State Legislature v. Arizona Independent
Redistricting Commission and the Future of Redistricting Reform_, 51 Ariz. St. L. J. 551, 582
(2019) (stating that adopting of Amendment No. 1 in 2018 "sets Missouri apart from all
other states in its focus on 'partisan fairness' and puts it among a small group of states that
incorporate 'competitiveness' as a priority criteria").

$5.00, SJR 38 deletes the dollar limitation, and would thereby prohibit gifts from paid lobbyists entirely. SJR 38 also reduces the contribution limits in campaigns for state senator by $100.00, from $2,500.00 to $2,400.00 (it does not alter the $2,000.00 contribution limit in races for the state House of Representatives). SJR 38 also proposes to delete the cost-of-living adjustment to the campaign contribution limits currently found in Article III, § 2(c).

SJR 38's most significant provisions modify the process for reapportioning state legislative districts.

SJR 38 renames the existing House and Senate reapportionment commissions as the "house independent bipartisan citizens commission" and the "senate independent bipartisan citizens commission." Under the existing Constitution, the members of the House reapportionment commission are appointed by the Governor, from lists of nominees submitted by the two major political parties' congressional district committees, while members of the Senate reapportionment commission are appointed by the Governor from lists of nominees submitted by the parties' State committees. *See* Article III, § 3(c)(2), 7(b). SJR 38 proposes to modify this selection process so that the parties' State committees, as well as their congressional district committees, will both make nominations to each of the redistricting commissions. As a result of the additional nominations coming from the different party committees, the membership of the House redistricting commission would increase from sixteen to twenty members, and the Senate commission would expand from ten to twenty members. Under Article III, § 7(b), the parties' State committees currently nominate twenty candidates to fill all ten spots on the Senate reapportionment commission. Under SJR 38, the influence of the parties' State committees would be diminished: the State committees would nominate ten candidates to fill only four spots (or twenty percent of the members) on each of the two redistricting commissions. SJR 38 also adds a provision

5

prohibiting any individual from serving on both commissions during the same redistricting cycle.

SJR 38 completely eliminates the post of "Nonpartisan State Demographer," one of the primary features of the redistricting process established by Amendment No. 1. Under Amendment No. 1, the Nonpartisan State Demographer is charged with creating tentative redistricting maps for both the House of Representatives and for the Senate, which are then reviewed by the reapportionment commissions for each house (with a super-majority vote required to modify the Nonpartisan State Demographer's tentative plans). Having eliminated the office of Nonpartisan State Demographer, SJR 38 specifies instead that the redistricting commissions will themselves develop the redistricting maps for the House and Senate, rather than merely reviewing the Nonpartisan State Demographer's tentative redistricting plans. Under SJR 38, the commissions are required to submit final maps to the Secretary of State within six months after the commissions' appointment; those maps must be approved by at least seventy percent of the commissions' members. If the commissions fail to timely submit redistricting plans, SJR 38 provides that maps will be developed by a commission consisting of six Court of Appeals judges, appointed by the Missouri Supreme Court. This process is similar, although not identical, to the redistricting process which was in place prior to the adoption of Amendment No. 1 in 2018.

SJR 38 proposes to limit judicial challenges to redistricting plans developed under its provisions. The resolution specifies that "[o]nly an eligible Missouri voter who sustains an individual injury by virtue of residing in a district that [allegedly violates the state or federal constitutions, or federal law], and whose injury is remedied by a differently drawn district, shall have standing." SJR 38 specifies that, if a court finds that a legal violation has occurred, "its judgment shall adjust only those districts, and only those parts of district boundaries, necessary to bring

6

the map into compliance." The resolution gives the Missouri Supreme Court exclusive appellate jurisdiction in any such case.

SJR 38 also proposes to substantially modify the criteria which govern the redistricting process. SJR 38 provides that "[d]istricts shall be as nearly equal as practicable in population, and shall be drawn on the basis of one person, one vote." The resolution specifies that districts will be deemed to be "as nearly equal as practicable in population" if no district deviates by more than one percent from the state-wide mean population per district, although deviations up to three percent may be permitted to allow districts to follow existing political subdivision boundaries. The gloss which SJR 38 places on "as nearly equal as practicable in population" departs from the current constitution (as amended by Amendment No. 1 in 2018), which provides that "[l]egislative districts shall each have a total population as nearly equal as practicable to the ideal population for such districts" ("ideal population" being the state-wide mean per-district population). Mo. Const. Art. III, § 3(c)(1)a.[2]

The resolution provides that legislative districts must be drawn to comply with the United States Constitution and applicable federal laws, including the Voting Rights Act of 1965, and specifies that "no district shall be drawn in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." This alters the current non-discrimination criterion, which specifies that "districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or diminishing their ability to elect

---

[2]     It may also be significant that the existing Constitution specifies that "ideal population" shall be determined by calculating the per-district mean of "the total population of the state reported in the federal decennial census," while SJR 38 provides that the "ideal population" shall be calculated by dividing the total number of districts into "the statewide population data being used."

7

representatives of their choice, whether by themselves or by voting in concert with other persons." Mo. Const. Art. III, § 3(c)(1)b.

Subordinate to the principles requiring an approximately equal population distribution and prohibiting racial discrimination, SJR 38 requires that "districts shall be composed of contiguous territory as compact as may be." Next, SJR 38 specifies that, to the extent consistent with the foregoing, "communities shall be preserved," meaning that "district lines follow political subdivision lines to the extent possible." The resolution provides detailed criteria by which to determine whether and how to divide counties and municipalities where necessary. Finally, SJR 38 provides that "[d]istricts shall be drawn in a manner that achieves partisan fairness and, secondarily, competitiveness, but the standards [described above] shall take precedence over partisan fairness and competitiveness." The resolution substantially relaxes the standards used to gauge the "partisan fairness" and "competitiveness" of particular redistricting plans. In particular, under Amendment No. 1 the Demographer is required to draw maps which achieve an "efficiency gap" between the voting power of each party's supporters "as close to zero as practicable." Art. III, § 3(c)(1)b. Under SJR 38, on the other hand, redistricting maps will be acceptable so long as the "efficiency gap" does "not exceed fifteen percent."

Besides modifying the existing criteria, the primary change to the redistricting standards which would be effected by SJR 38 concerns the relative weight to be given to "partisan fairness" and "competitiveness" in the redistricting process. The current Constitution (as amended by Amendment No. 1) places the achievement of "partisan fairness and, secondarily, competitiveness," in the highest priority category of redistricting criteria, alongside the directive to achieve equality of population and the prohibition on racial discrimination. *See* Mo. Const. Art. III, § 3(c)(1). Considerations of geographical contiguity, preservation of the boundaries

8

of political subdivisions, and compactness are subordinate criteria. *Id.* In contrast, SJR 38 removes partisan fairness and competitiveness from the highest-priority category, and instead places them at the very bottom of the priority listing, below contiguity, preservation of existing boundaries, and compactness.

The General Assembly exercised its prerogative under § 116.155[3] to draft the official summary statement for SJR 38. The General Assembly's summary statement proposes to ask voters:

Shall the Missouri Constitution be amended to:

- Ban all lobbyist gifts to legislators and their employees;

- Reduce legislative campaign contribution limits; and

- Create citizen-led independent bipartisan commissions to draw state legislative districts based on one person, one vote, minority voter protection, compactness, competitiveness, fairness, and other criteria?

SJR 38 was passed by the Senate on May 10, 2020, and by the House of Representatives on May 13, 2020. It is slated to appear on the November 3, 2020 general election ballot as Amendment No. 3.

On May 18, the Challengers filed their Petition for Declaratory Judgment and Injunctive Relief under Section 116.190, RSMo, contending that the official ballot summary drafted by the General Assembly for SJR 38 was insufficient and unfair. The Petition named as defendants the following individuals (solely in their official capacities): Secretary of State John R. Ashcroft; Senate President *Pro Tem* Dave Schatz; Speaker of the House of Representatives Elijah Haahr; and State Senator Daniel Hegeman, the sponsor of SJR 38. The defendants are jointly represented by the Attorney General's Office, and have filed a joint brief in this

---

[3] Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated through the 2019 Cumulative Supplement.

9

Court. For ease of reference, we refer to the defendants collectively as the "Secretary of State."

In their Petition, the Challengers alleged that each of the three bullet points contained in the General Assembly's summary statement is insufficient and unfair. The Challengers alleged that the first bullet of the summary is insufficient and unfair because SJR 38 merely "reduce[s] the five-dollar limit on *de minimis* gifts to zero," while leaving in place exceptions to the gift restrictions for unpaid lobbyists, and the exception for "gifts [to legislators or their staffs] . . . from those related to them within the fourth degree by blood or marriage." Mo. Const. Art. III, § 2(b). The Challengers also alleged that,

> in light of the dramatic and significant changes that SJR 38 will make to redistricting, it is misleading and manipulative for the fifty-word summary statement to devote any precious space – let alone the entire first clause – to the unremarkable fact that SJR 38 would amend the Constitution to preclude legislators and their employees from receiving gifts from paid lobbyists worth five dollars or less.

Challengers' Petition alleged that the second bullet point of the General Assembly's summary statement is insufficient and unfair because SJR 38 only reduces contribution limits in *Senate* campaigns, and therefore does not "[r]educe *legislative* campaign contribution limits" as the summary states. Because the reduction of $100 to the Senate campaign contribution limit constitutes only a four percent reduction, for only one house of the General Assembly, the Challengers contended that the summary's emphasis on this provision would "unfairly color[ ] the views of the voters," and would "mislead and deceive voters into believing that SJR 38 would make meaningful reductions in contribution limits for all legislative campaigns, which is untrue."

With respect to the third bullet point, the Petition alleged that the summary statement inaccurately states that SJR 38 "create[s]" new commissions, when it "simply renames" the existing House and Senate reapportionment commissions.

10

The Challengers also argued that the third bullet "is misleading because it fails to inform voters that SJR 38 eliminates the office of the Nonpartisan State Demographer, which provides Missouri's primary defense against partisan gerrymandering." The Challengers alleged that the third bullet point "falsely asserts that the Commissions would be 'independent,'" when the commissions "would in fact comprise individuals with partisan interests who were hand-selected by the State's political parties and elected officials." The Petition also alleged that the third bullet is insufficient and unfair because it fails to acknowledge that "the Missouri Constitution *already* provides that districts are to be drawn on the basis of the[ ] factors" listed in the third bullet. The Challengers also complained that the third bullet fails to acknowledge that SJR 38 will significantly reduce the impact of partisan fairness and competitiveness on redistricting, by making the test to determine fairness and competitiveness substantially more lenient, and by removing those criteria from the highest priority category, and instead making them the lowest priority considerations in formulating district maps.

The petition prayed that the circuit court vacate the existing summary statement and either order the General Assembly to prepare a new one, or certify the following summary statement instead:

Shall the Missouri Constitution be amended to:

Eliminate the office of Nonpartisan State Demographer, currently responsible for drawing draft legislative district maps, and give map drawing responsibility to Commissions comprised of partisan representatives; and

Make partisan fairness and competitiveness the least important factors when drawing district maps.

The parties agreed to submit the case to the circuit court for decision on a Joint Stipulation of Facts and Exhibits, the parties' trial briefs, and oral argument by counsel. The parties' Joint Stipulation identified the parties, provided a

11

chronology of relevant events, and submitted to the court stipulated copies of the relevant documents.

Following a hearing on August 7, 2020, the circuit court entered its Final Judgment on August 17. The circuit court agreed with the Challengers that all three bullet points in the General Assembly's proposed summary statement are insufficient and unfair. The court therefore vacated the General Assembly's statement, and certified an alternative summary statement which the court had drafted. The circuit court began its legal analysis of the General Assembly's summary statement language with these general observations:

> [T]he legislature's summary fails to inform voters that adopting SJR 38 would eliminate the legislative redistricting rules Missourians overwhelmingly adopted just two years ago to combat political gerrymandering and replace them with a redistricting process similar in substance to the one they just voted to abandon. . . . Where, as here, the legislature seeks to override the recent, clearly expressed will of Missouri voters on a matter as important as redistricting, the law requires that voters by plainly informed what they are being asked to consider.

The judgment found, first, that "the summary statement is insufficient and unfair because it fails to even allude to SJR 38's central feature: the wholesale repeal of voter-approved rules for redistricting and replacing them with prior redistricting rules designed to benefit incumbent legislators." "The 'central purpose' or 'primary objective' of SJR 38 is to effectively repeal Amendment 1. Accordingly, the summary statement must alert voters to that change in some fashion. Instead, the General Assembly's statement does not mention the change at all."

The circuit court also agreed with the Challengers that the first bullet point misleadingly claims that SJR 38 would ban _all_ lobbyist gifts, when it only bans gifts from unrelated, paid lobbyists. The court also agreed with Challengers that the second bullet point is misleading when it suggested that contribution limits are reduced in _all_ "legislative campaign[s]," when the resolution only effects "a meager

12

4% reduction to **senatorial** campaign contribution limits while leaving representative contribution limits untouched." The court also found that the third bullet is deceptive in referring to the "creat[ion]" of "independent" and "citizen-led" redistricting commissions, when SJR 38 instead "simply renames two legislative commissions that already exist," and the members of the commissions will be selected by the joint efforts of the major political parties and the Governor. The judgment also found the third bullet point to be misleading by suggesting that SJR 38 establishes new redistricting criteria, when the listed criteria are already specified in the Constitution, and by failing to acknowledge that the resolution substantially reduces the significance of partisan fairness and competitiveness in the redistricting process.

After vacating the General Assembly's summary statement, the circuit court instead certified to the Secretary of State the following alternate summary statement, for inclusion in the official ballot title to appear on the November 3, 2020 general-election ballot:

Shall the Missouri Constitution be amended to:

- Repeal rules for drawing state legislative districts approved by voters in November 2018 and replace them with rules proposed by the legislature;

- Lower the campaign contribution limit for senate candidates by $100; and

- Lower legislative gift limit from $5 to $0, with exemptions for some lobbyists?

The Secretary of State filed his Notice of Appeal on August 18, 2020. The parties submitted the record and their briefing on an expedited basis, and we heard oral argument on August 28.[4]

---

[4] In addition to briefing by the parties, we received an *amicus curiae* brief supporting the Secretary of State from the Missouri Chamber of Commerce and Industry and other trade organizations, and *amici* briefs supporting the challengers from a group of

13

**Standard of Review**

The parties submitted the case to the circuit court for decision based on their Joint Stipulation of Facts and Exhibits. "'[W]hen there is no underlying factual dispute that would require deference to the trial court's factual findings,' we apply '[*d*]*e novo* review [to] the trial court's legal conclusions about the propriety of the . . . summary statement[ ]." *Sedey v. Ashcroft*, 594 S.W.3d 256, 262 (Mo. App. W.D. 2020) (quoting *Brown v. Carnahan*, 370 S.W.3d 637, 653 (Mo. 2012)).

**Discussion**

The summary statement which the Challengers attack was drafted by the General Assembly pursuant to the authority granted by § 116.155.1, which provides that "[t]he general assembly may include the official summary statement . . . in any statewide ballot measure that it refers to the voters." The Missouri Supreme Court has explained that,

> [i]f the General Assembly writes the ballot title for a measure it proposes to voters, the title must be "a true and impartial statement of the purposes of the proposed measure in language neither intentionally argumentative nor likely to create prejudice either for or against the proposed measure." Section 116.155.2. The summary statement is limited to 50 words, excluding articles. *Id.*
>
> Section 116.190, . . . in relevant part, allows any citizen to challenge the official ballot title proposed by the General Assembly *before* an election takes place. The challenger must "state the reason or reasons why the summary statement portion of the official ballot title is insufficient or unfair." Section 116.190.3. This section is a procedural safeguard that is "designed to assure that the desirability of the proposed amendment may be best judged by the people in the

former Missouri federal and State legislators, and from a group of national and Missouri-based civil-rights organizations.

Under § 115.125.3, "[n]o court shall have the authority to order an individual or issue be placed on the ballot less than eight weeks before the date of the election." In *Dotson v. Kander*, 435 S.W.3d 643 (Mo. 2014), the Missouri Supreme Court interpreted this provision "to prohibit court-ordered modifications to a ballot title" later than the date specified in the statute. *Id.* at 645; *see also* § 116.190.5 (providing that an action challenging a ballot title "shall be extinguished" "fifty-six days prior to election in which the measure is to appear," unless this deadline is extended by the court for "good cause"). Eight weeks before the November 3, 2020 election is September 8, 2020.

voting booth." Such challenges are necessary "to prevent a self-serving faction from imposing its will upon the people without their full realization of the effects." Judicial review of a ballot title is especially important in a legislature-proposed ballot initiative. This is true because the proponent of the initiative – the General Assembly – writes the ballot title as well as the proposed amendment without any review of the ballot title by the executive department. . . . [¶] In contrast, the ballot summary of a citizen-proposed initiative petition is written by the secretary of state and reviewed by the attorney general.

*Dotson v. Kander*, 464 S.W.3d 190, 193-94 & n.4 (Mo. 2015) (other citations and footnote omitted).

Under § 116.190.3, "[t]he party challenging the language of the summary statement bears the burden to show that the language is insufficient or unfair." *Hill v. Ashcroft*, 526 S.W.3d 299, 308 (Mo. App. W.D. 2017) (citation omitted). "'Insufficient means "inadequate; especially lacking adequate power, capacity, or competence." The word "unfair" means to be "marked by injustice, partiality, or deception."'" *Id.* (citations omitted).

The summary statement "should accurately reflect both the legal and probable effects of the propos[al]." *Shoemyer v. Sec'y of State*, 464 S.W.3d 171, 174 (Mo. 2015) (citing *Brown v. Carnahan*, 370 S.W.3d 637, 654 (Mo. 2012)). We have explained that "[t]he summary statement should inform voters of the 'central feature[s]' of the initiative or referendum proposal." *Stickler v. Ashcroft*, 539 S.W.3d 702, 709 (Mo. App. W.D. 2017) (citation omitted). This principle derives from "[t]he commonly understood meaning of a 'summary,'" namely, "'a short restatement of the main points (as of an argument) for easier remembering, for better understanding, or for showing the relation of the points.'" *Id.* at 709 n.4 (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE 2289 (unabridged ed. 1993)).

While a summary statement should describe a ballot measure's central features, it "'need not set out the details of the proposal to be fair and sufficient.'" *Stickler*, 539 S.W.3d at 709 (quoting *Brown*, 370 S.W.3d at 656). "The omission of

15

proposed changes from the summary statement will not render the ballot summary insufficient if they are not central features of the proposed amendment." *Sedey*, 594 S.W.3d at 269 (citation omitted).

"The applicable question is not whether the summary drafted is the best summary, 'but whether [it] gives the voter a sufficient idea of what the proposed amendment would accomplish, without language that is intentionally unfair or misleading. The idea is to advise the citizen what the proposal is about.'" *Id.* at 263 (citation omitted). The question for the court "is whether the summary statement contains an impartial, intelligible, and accurate summary of the [ballot measure]'s central purpose and effects." *Stickler*, 539 S.W.3d at 710.

With these general principles in mind, we turn to the Challengers' specific attacks against the three bullet points which make up SJR 38's official summary statement.

## I.

The first bullet point of the official summary statement asks Missouri voters whether they wish to amend the Constitution to "[b]an all lobbyist gifts to legislators and their employees." The Challengers argue that this is an insufficient and unfair summary of SJR 38, because the resolution does not ban "all" gifts from lobbyists. They emphasize that SJR 38 does not alter the language in Article III, § 2(b) of the Missouri Constitution, which limits the gift restriction to "a gift . . . from *any paid lobbyist or lobbyist principal*" – thus excluding *unpaid* lobbyists. The Challengers also emphasize that SJR 38 retains Article III, § 2(b)'s exception for gifts "from those related to [legislators or their staffs] within the fourth degree by blood or marriage."

The first bullet point uses the expansive word "all" to describe the "lobbyist gifts" which will be banned if the amendment passes. "The word 'all' is unqualified and unambiguous." *Estes v. Cole Cnty.*, 437 S.W.3d 307, 312 (Mo. App. W.D. 2014).

16

"'All' means '[e]very,'"[5] "'each one of,'"[6] or "'the whole number, quantity or amount,'" without exception.[7] Thus, the summary statement tells voters that, if SJR 38 passes, *every* gift from a lobbyist to a legislator or legislative employee will be prohibited, *without exception.*

As the Challengers argue, the first bullet point does not accurately reflect what SJR 38 would actually accomplish, since it would only prohibit *some* lobbyist gifts, namely those from "any paid lobbyist or lobbyist principal," and would allow an exception for gifts from relatives of the legislator or staffer.

The first bullet point fails to state that its gift ban would apply only to _paid_ lobbyists. The Secretary of State argues that a common dictionary definition of a "lobbyist" includes only persons who perform legislative advocacy on behalf of others *for compensation.* We cannot agree that use of the term "lobbyist," standing alone, necessarily connotes compensation. At least one common dictionary definition of a "lobbyist" is simply "one who conducts activities aimed at influencing or swaying public officials and especially members of a legislative body on legislation : a person engaged in lobbying public officials."[8] Moreover, while we need not decide in this case whether SJR 38 incorporates the definition of a "legislative lobbyist" found in § 105.470, it is significant that the statutory definition specifies four circumstances in which an individual seeking to influence legislative action may be considered a "legislative lobbyist" – only two of which involve compensation for lobbying activities. Section 105.470(5) provides in relevant part:

---

[5]     *Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330, 344 (Mo. 1996) (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 54 (1976)).

[6]     *State ex rel. State Hwy. Comm'n v. Klipsch*, 414 S.W.2d 783, 786 (Mo. 1967).

[7]     *Kinder v. Mo. Dep't of Corr.*, 43 S.W.3d 369, 373 (Mo. App. W.D. 2001) (quoting WEBSTER'S COLLEGIATE DICTIONARY 29 (10th ed. 1993)).

[8]     *See* www.merriam-webster.com/dictionary/lobbyist (accessed Aug. 26, 2020).

17

"**Legislative lobbyist**" [means] any natural person who acts for the purpose of attempting to influence the taking, passage, amendment, delay or defeat of any official action on any bill, resolution, amendment, nomination, appointment, report or any other action or any other matter pending or proposed in a legislative committee in either house of the general assembly, or in any matter which may be the subject of action by the general assembly and in connection with such activity, meets the requirements of any one or more of the following:

(a)     Is acting in the ordinary course of employment, which primary purpose is to influence legislation on a regular basis, on behalf of or for the benefit of such person's employer, except that this shall not apply to any person who engages in lobbying on an occasional basis only and not as a regular pattern of conduct; or

(b)     Is engaged for pay or for any valuable consideration for the purpose of performing such activity; or

(c)     Is designated to act as a lobbyist by any person, business entity, governmental entity, religious organization, nonprofit corporation, association or other entity; or

(d)     Makes total expenditures of fifty dollars or more during the twelve-month period beginning January first and ending December thirty-first for the benefit of one or more public officials or one or more employees of the legislative branch of state government in connection with such activity.

Subparts (c) and (d) of this statutory definition do not require that the "legislative lobbyist" receive compensation for their advocacy work. *See Calzone v. Summers*, 942 F.3d 415, 418-19 (8th Cir. 2019) (*en banc*) (individual fell within § 105.470(5)'s definition of a "legislative lobbyist" where he advocated policy positions to State legislators as the unpaid president of a nonprofit organization which "is effectively his alter ego," because he had been "designated to act as a lobbyist" by the nonprofit).

Moreover, we can envisage numerous situations in which persons who are not compensated for their lobbying work engage in such activities. For example, individuals may lobby on their own behalf; corporate managers, small businesspersons, and professionals may lobby without compensation on behalf of

18

trade or professional associations in which they or their employers are members; workers may lobby on behalf of their labor unions; and interested individuals may volunteer to lobby on behalf of public-policy or charitable organizations which they support. The fact that SJR 38 exempts from the gift ban persons who engage in "lobbying," but are not compensated *for their lobbying work*, is a significant limitation on the scope of the restriction. This qualification renders the existing summary language – which asserts that SJR 38 will "ban <u>all</u> lobbyist gifts" – insufficient and unfair.

The fact that the gift ban only applies to paid lobbyists can be easily described by amending the first bullet point to state that SJR 38 will "[b]an gifts from paid lobbyists to legislators and their employees."[9]

On the other hand, it was not necessary for the summary statement to refer to the exception for gifts from relatives of a legislator or legislative staffer. As explained above, a summary statement "'need not set out the details of the proposal to be fair and sufficient.'" *Stickler v. Ashcroft*, 539 S.W.3d 702, 709 (Mo. App. W.D. 2017) (quoting *Brown v. Carnahan*, 370 S.W.3d 637, 656 (Mo. 2012)). This is especially true in the context of the compressed fifty-word limit applicable to summary statements drafted by the General Assembly. The fact that SJR 38 permits legislators and legislative employees to continue to receive gifts from relatives who are also paid lobbyists constitutes a "detail" rather than a "central feature" of SJR 38. Particularly with the elimination of the word "all" from the first bullet point, no further reference to the allowance of gifts from relatives was required.

The Challengers also argue that the first bullet point was insufficient because it fails to state that SJR 38 will only reduce the gift restriction from the

---

[9] We eliminate the word "all" due to considerations of space, and because the summary already states that the relevant gifts are "ban[ned]" without qualification.

19

current $5.00 limit, to an outright ban. We disagree. In *Brown*, 370 S.W.3d 637, the Missouri Supreme Court held that a summary statement for an initiative seeking to limit interest rates charged by consumer lenders was fair and sufficient when it merely asked voters whether "Missouri law [should] be amended to limit the annual rate of interest," without specifying that the new limit would be thirty-six percent. *Id.* at 663. The Court explained that

> [h]ere, the secretary of state prepared a summary statement that was accurate as to the purpose of the initiative – to limit the permissible interest rate for certain types of loans – and there was no requirement to articulate specifically the proposed 36-percent rate limit. That the court might believe that the additional information about the rate limit would render a better summary is not the test.

*Id.* at 664 (citation omitted). As we recognized in *Boeving v. Kander*, 493 S.W.3d 865 (Mo. App. W.D. 2016), *Brown* held that "greater specificity was not required" where the existing summary was "'vague but accurate.'" *Id.* at 878. Here, it is accurate to say that SJR 38 would "ban" gifts from paid lobbyists, without specifically quantifying the effect of the ban.

## II.

The second bullet point of the General Assembly's official summary statement states that passage of SJR 38 will "[r]educe legislative campaign contribution limits." The Challengers argue that this bullet point is insufficient and unfair because SJR 38 only reduces the contribution limit with respect to *Senate* races, and then only by $100 (or four percent), from $2,500 to $2,400. The Challengers argue that the bullet point should be revised to make explicit that the reduction in contribution limits only applies to *Senate* candidates, and to advise voters of the *magnitude* of the reduction (which the Challengers characterize as trivial). We disagree.

SJR 38 proposes to make two modifications to Article III, § 2(c) of the Missouri Constitution. First, it reduced the contribution limit stated in the

20

Constitution for Senate races from $2,500, to $2,400.  Second, it eliminates the biannual adjustment of the contribution limits to reflect cumulative changes to the Consumer Price Index since 2018.

Although SJR 38 only alters the stated limit on contributions to *Senate* campaigns, it also affects the contribution limits on *House* races in at least two ways.  First, SJR 38 proposes to eliminate the Consumer Price Index adjustment, which would generally (although not universally) result in future increases to the contribution limits for both Senate and House races.

But critically, SJR 38 would also have the effect of actually reducing the House contribution limit which is now in effect.  Under Amendment No. 1, the House and Senate contribution limits are adjusted every two years after 2018 to reflect changes to the Consumer Price Index.  Such a change in fact occurred effective January 1, 2020.  The Consumer Price Index adjustment increased the campaign contribution limit for Senate races to $2,559 from $2,500, and increased the limit for House races to $2,046 from $2,000.  Because SJR 38 eliminates all mention of a Consumer Price Index adjustment, and states that the contribution limit for House races is $2,000, it would have the effect of reducing the current contribution limit for House races from $2,046 to $2,000.

Although they do not dispute the Secretary of State's description of the Consumer Price Index adjustments which took effect on January 1, 2020, the Challengers argue that we should not consider those adjustments.  The Challengers point out that the Secretary of State affirmatively represented to the circuit court that SJR 38 did not alter the House campaign contribution limit, and presented no evidence to the circuit court to prove that the 2020 adjustments actually occurred.  We recognize that the Secretary of State may not have made this precise argument in the circuit court.  Challenges to ballot summaries like this case are commonly litigated on a highly expedited schedule.  Such cases are not merely private

21

disputes, but implicate the overriding public interest that voters be given fair and impartial information, to enable them to exercise their franchise in an informed manner. Moreover, the Secretary of State's argument relies on the Consumer Price Index adjustment mechanism specified in the Constitution itself, Consumer Price Index data which is documented in official publications of the United States Department of Labor's Bureau of Labor Statistics, and the Missouri Ethics Commission's official announcement of the campaign contribution limits in effect in 2020. These are matters of which we can take judicial notice.[10] In these circumstances, we believe it is appropriate to consider the Secretary of State's argument, even if it varies somewhat from the position the Secretary took in the circuit court.

Because the House campaign contribution limit has been adjusted upward based on changes to the Consumer Price Index, but would be returned to its pre-adjustment level of $2,000 if SJR 38 passes, the second bullet point is accurate when it states that the resolution would "[r]educe *legislative* campaign contribution limits," not merely the contribution limits for Senate races.

The Challengers also argue that it is necessary to include some reference in the summary statement to the _amount_ of the reduction to the contribution limits (which they contend is minimal). For the reasons explained in § I, above, we disagree. The second bullet point accurately states that, if SJR 38 passes, legislative campaign contribution limits will be "reduc[ed]." While this may be vague, it _is_ "accurate as to the purpose of the initiative." *Brown*, 370 S.W.3d at 664.

---

[10] Courts around the country have held that historical Consumer Price Index information is subject to judicial notice. *See, e.g.*, *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011); *Greenhill v. United States*, 96 Fed. Cl. 771, 783 n.18 (2011) (taking notice of Consumer Price Index data with the observation that "courts have freely taken judicial notice of relevant, readily-available data"); *Sweeney v. Sweeney*, 135 N.E.3d 1189, 1196 (Ohio App. 2019); *Daunhauer v. Daunhauer*, 295 S.W.3d 154, 159 n. 9 (Ky. App. 2009).

Even if we believed that providing additional information would be preferable, the General Assembly's failure to include any more specific information does not invalidate the "vague but accurate" second bullet. *Boeving*, 493 S.W.3d at 878.

We reject the Challengers' attacks on the second bullet point, and conclude that the circuit court erred in revising it.

### III.

The third bullet point of the official summary statement drafted by the General Assembly tells voters that SJR 38 will

> Create citizen-led independent bipartisan commissions to draw state legislative districts based on one person, one vote, minority voter protection, compactness, competitiveness, fairness, and other criteria.

The Challengers attack the third bullet point on multiple fronts. They argue that it fails to mention a critical feature of SJR 38 – its elimination of the position of Nonpartisan State Demographer. They argue that its statement that SJR 38 will "create" new redistricting commissions is misleading, since (they contend) the resolution merely makes minor adjustments, and gives a new name, to redistricting commissions which have existed for decades. They argue that the statement that the redistricting commissions will be "citizen-led" and "independent" is inaccurate and misleading, since the commissions will be appointed by the Governor based on nominations from the two major political parties, and may contain present or former elected officials or party operatives. Finally, they argue that the description of the criteria on which redistricting decisions will be based fails to alert voters to the substantial revisions to, and re-ordering of, the existing redistricting standards, and falsely suggests that the listed standards are innovations which will only become law if SJR 38 passes.

We find three major problems in the third bullet point as currently drafted, which require that it be rewritten.

23

1. First, the third bullet point fails to make any reference to SJR 38's elimination of the office of Nonpartisan State Demographer, one of the primary features of the redistricting process adopted by voters in 2018.

The Secretary of State's opening Brief acknowledges the centrality of the Nonpartisan State Demographer to Missouri's current redistricting process, and acknowledges that one of the central features of SJR 38 is to transfer the Nonpartisan State Demographer's redistricting responsibilities to the bipartisan redistricting commissions:

> Under current law, the Constitution provides that the "nonpartisan state demographer" shall have principal responsibility for drawing legislative maps in Missouri. MO. CONST. art. III, § 3(a).
>
> . . . .
>
> . . . If enacted, SJR 38 will change the process of redistricting by creating two new entities, called the "house independent bipartisan citizens commission" and the "senate independent bipartisan citizens commission." These entities will replace the nonpartisan state demographer and assume principal responsibility for redistricting the house and senate districts, respectively. . . .
>
> SJR 38 eliminates the role of the nonpartisan state demographer in redistricting for both house and senate districts.

(Record citations omitted.)

The position of Nonpartisan State Demographer created in 2018 by Amendment No. 1 altered the commission-based process for redistricting which had existed in Missouri since constitutional amendments in 1966, and which had governed the last five decennial redistricting cycles. The process for selecting the Demographer is specified in detail in Article III, § 3(b) of the Constitution. The involved process detailed in the Constitution is designed to insulate the Demographer from partisan influence to a substantial extent. First, § 3(b) specifies that any Missouri resident may apply to become the Demographer. The State Auditor is charged with reviewing the applications, and submitting to the majority

24

and minority leaders of the Senate a list of at least three candidates "with sufficient expertise and qualifications, as determined by the state auditor, to perform the duties of the nonpartisan state demographer." If the majority and minority leaders are able to agree on a single candidate, that person becomes the Nonpartisan State Demographer. If not, each Senate leader may strike up to one-third of the Auditor's list of candidates, and the Auditor then selects the Demographer by lot from the remaining names. The Demographer shall serve a five-year term, and may be reappointed once. The Demographer may not have held a partisan elected office for four years prior to appointment, and may not serve in the general assembly for four years after presentation of the demographer's last redistricting map.

As discussed above, the Nonpartisan State Demographer prepares tentative reapportionment plans and maps, using the criteria specified in the Constitution (criteria which were largely enacted as part of Amendment No. 1 in 2018). Unless seventy percent of the members of the House or Senate reapportionment commissions vote to make changes to the demographer's tentative plans, those plans take effect.

Given the centrality of the Nonpartisan State Demographer to the reforms enacted by voters in 2018, the elimination of this constitutional officer is a central feature of SJR 38. In order for the ballot summary to be fair and sufficient, and give voters a meaningful sense "of what the proposed amendment would accomplish," *Sedey v. Ashcroft*, 594 S.W.3d 256, 263 (Mo. App. W.D. 2020) (citation omitted), the elimination of the post of Nonpartisan State Demographer must be referenced in the ballot title in some fashion.

We recognize that the third bullet point states that, if SJR 38 is passed, bipartisan commissions will have responsibility for drawing state legislative districts. Presumably, some other person or entity had the map-drawing responsibility previously, and one could assume that the previously-responsible

25

person or entity will be divested of authority if it is given to the bipartisan commissions. But this sort of "negative implication" argument is not sufficient to alert voters to the elimination of the Nonpartisan State Demographer's role in the redistricting process. As the Missouri Supreme Court has recognized, "[s]ometimes it is necessary for the . . . summary statement to provide a context reference that will enable voters to understand the effect of the proposed change." *Brown*, 370 S.W.3d at 654; *see also Boeving v. Kander*, 493 S.W.3d 865, 879 (Mo. App. W.D. 2016); *Mo. Mun. League v. Carnahan*, 364 S.W.3d 548, 553 (Mo. App. W.D. 2011).

The Secretary of State argues that, under *Hill v. Ashcroft*, 526 S.W.3d 299 (Mo. App. W.D. 2017), "there is no requirement that the summary statement recite the proposal's impact on preexisting laws at all." The Secretary reads *Hill* far too broadly. We recognize that *Hill* states that "Missouri courts have never held that a summary statement prepared by the secretary of state must explain the initiative's potential effect on existing or future statutes to be fair and sufficient." 526 S.W.3d at 314. The Court made that statement in a particular context, however. In *Hill*, *after* the Secretary of State had prepared a summary for a proposed constitutional amendment, the legislature enacted a bill which would arguably have been nullified if the proposed constitutional amendment were adopted by voters. We held that it was unnecessary to revise the summary to reflect the passage of the conflicting statute after the summary's drafting. We emphasized that requiring that ballot summaries reflect later developments would create an undue burden on election authorities, since "the consequences are potentially ever changing due to the political landscape." *Id.* at 314. We also emphasized that, even without an explicit reference to the later-enacted statute, the effect of the proposed constitutional amendment on contrary statutes "is self-evident," since "[i]t is commonly understood that constitutional amendments will supersede statutes that are in contravention with the amended constitutional provision." *Id.* at 314, 315.

26

It is in this particular context – where the effect of a proposed constitutional amendment on contrary statutes was "self-evident" and "commonly understood" – that *Hill* held that it was unnecessary for the summary to "explain the initiative's potential effect on existing or future statutes." *Id.* at 314. *Hill* does not purport to modify, or abandon, the general principle that a summary statement "should accurately reflect both the legal and probable effects of the propos[al]." *Shoemyer v. Sec'y of State*, 464 S.W.3d 171, 174 (Mo. 2015) (citing *Brown*, 370 S.W.3d at 654). Nor does *Hill* disavow the principle that "[s]ometimes it is necessary for the . . . summary statement to provide a context reference that will enable voters to understand the effect of the proposed change." *Brown*, 370 S.W.3d at 654 (citation omitted). (Nor could *Hill* reject these fundamental principles, given their announcement by the Missouri Supreme Court.) In ballot-summary cases, courts are called upon to apply the open-ended standards of § 116.190.3 (which ask whether a summary statement "is insufficient or unfair") to an endless variety of ballot measures and summary statements – and frequently on a sharply compressed timetable. Necessarily, each appellate decision in this area is inherently tied to the specific measures, the specific summary statements, and the specific circumstances presented in the particular case; any more general statements appearing in such cases must be read in that light.

In this case, SJR 38's elimination of the Nonpartisan State Demographer's role in the redistricting process is not merely a "potential effect" of passage of the resolution; SJR 38 proposes to directly eliminate the constitutional provision which creates the Demographer's office. Where a ballot measure's adoption would directly nullify or substantially alter existing legal rules, reference to the measure's effect on existing law may often be necessary to adequately inform voters of "the legal and probable effects of the propos[al]." *Hill* is not to the contrary.

27

In this case, to be fair and sufficient the ballot summary must explicitly refer to the elimination of the constitutional officer who currently holds (in the Secretary of State's words) "principal responsibility" for redistricting.

2. Second, the summary statement's characterization of the redistricting commissions as "citizen-led" and "independent" fails to accurately describe the membership and operation of the commissions.

Nothing in SJR 38 requires that the commissions be "citizen-led" in any meaningful sense, given that their membership is appointed by the Governor from nominations received from the State's two major political parties, without restriction on the public or partisan office those members may currently hold, or may have previously held.

The term "citizen-led" is given no clear meaning in the Constitution, or by SJR 38, and we are aware of no judicial decisions or other legal authorities which give content to the term. In his Brief, the Secretary of State argues that the bipartisan commissions are properly described as "citizen-led" for the following reasons:

> The new commissions are "citizen-led" within the ordinary and natural meaning of that phrase, and thus the description is fair and accurate to the average voter. The word "citizen" means "a member of a state: one who is claimed as a member of a state," and (more specifically) "a civilian as opposed to a soldier, policeman, or other specialized servant or functionary of the state." The new house and senate independent bipartisan commissions are unquestionably led by "citizens" under this plain meaning of this term. Notably in this context, the commissions are not led by public officials, and thus they are led by "citizens" in the specific sense of "civilians" who are not "other specialized servant[s] of the state," such as public officials.

(Citations omitted.)

The problem with the Secretary's argument is that nothing in SJR 38 requires that the bipartisan commissions be made up of "citizens" in this sense, or that such "citizens" will in fact "lead" the commissions. Although SJR 38 provides

28

that commissioners "shall be disqualified from holding office as members of the general assembly for four years following the date of the filing by the commission of its final redistricting plan," nothing in SJR 38 requires that commissioners be "civilian[s]" instead of "soldier[s], policem[e]n, or other specialized servant[s] or functionar[ies] of the state." Other than the forward-looking prohibition on service in the General Assembly, nothing in SJR 38 prevents commissioners from being current or former members of the General Assembly or executive branch, or from being officials of the political parties. This contrasts with the restrictions currently applicable to the Nonpartisan State Demographer: in addition to a forward-looking ban on service in the General Assembly, the Constitution specifies that the Demographer may not have held partisan elected office in the four years preceding appointment. Mo. Const. Art. III, § 3(b).

The selection process for the commissioners specified in SJR 38 is similar to the process used to fill the current redistricting commissions. We are informed by *amici* that, in the last redistricting round following the 2010 decennial census, the leaders of the House and Senate reapportionment commissions included a former Lieutenant Governor who was also a former member of both the Missouri House and Senate; an individual who formerly chaired the Missouri Republican Party and co-chaired the Republican National Committee; and a former State Senate candidate. Because none of the qualifications for service on the redistricting commissions have changed, and the selection process is similar, we presume that if SJR 38 passes, similarly distinguished, politically active individuals, with extensive prior (or current) histories of public service, may be appointed to, and may lead, future redistricting commissions. It is difficult to discern how commissions with such leadership can meaningfully be described as "citizen-led" – or how these redistricting commissions would be distinguishable from other State commissions which are _not_ characterized as "citizen-led."

29

It is also unclear what is meant by the characterization of the commissions as "independent." We have explained above that SJR 38 provides that the commission members will be nominated by the two major political parties (and therefore will be known to, and potentially active in, those parties), and that they will be appointed by the Governor. While the work of the commissions may not be subject to direct supervision or control (except through subsequent judicial challenges), the commissions are not "independent" of partisan or executive-branch influence through the selection process. In the context of the revisions of the third bullet point which are otherwise required, we substitute for the amorphous and undefined term "independent" a phrase explaining that the commissions will be "governor-appointed."

3.      A third and final difficulty with the third bullet point is that it asks Missouri voters whether they wish to amend the Constitution to create bipartisan commissions to draw state legislative districts "based on one person, one vote, minority voter protection, compactness, competitiveness, fairness, and other criteria." The summary statement falsely implies that SJR 38 *establishes* the listed criteria, when they already appear in the Constitution (by virtue of Amendment No. 1); equally important, the third bullet fails to suggest in _any_ fashion that SJR 38 proposes to significantly modify, and fundamentally reorder, the existing redistricting criteria.

The third bullet point's listing of redistricting criteria could just as easily apply to the current Constitution as to the modified version of Article III which would exist if SJR 38 passes. Each of the redistricting criteria is already contained in Article III, § 3(c).[11] Yet voters may be led by the summary statement to believe

---

[11]      "One person, one vote" refers to the requirement that coordinate legislative districts should have roughly equal population – a principle which already appears in the Missouri Constitution. *See Gray v. Sanders*, 372 U.S. 368, 381 (1963) (where the term "one

30

that those criteria will only be applied in Missouri if they cast their ballot in favor of SJR 38.

We addressed a similar issue in *Missouri Municipal League v. Carnahan*, 303 S.W.3d 573 (Mo. App. W.D. 2010). In that case, the summary statement for an initiative petition seeking to restrict eminent domain stated that the initiative would "requir[e] that any taking of property be necessary for public use *and that landowners receive just compensation.*" *Id.* at 586 (emphasis added). We held that the emphasized language needed to be removed from the summary statement, because it would mislead voters that they had to support the initiative if they wanted to assure property owners received just compensation when, in fact, "the Missouri Constitution has historically and does currently require just compensation for takings." *Id.* at 588. As we explained in a later, related case, the reference to "just compensation" "was unnecessary and potentially prejudicial in that it suggested a change was being made to the Constitution regarding 'just compensation' that was not being amended." *Mo. Mun. League v. Carnahan*, 364 S.W.3d 548, 553 (Mo. App. W.D. 2011). For the same reason as in the first *Missouri Municipal League* case, the listing of existing redistricting criteria in the third bullet point, with the false implication that they are being newly introduced, is unfair and insufficient, and must be removed from the summary.

Besides falsely claiming credit for introducing the redistricting criteria into the Missouri Constitution, the third bullet fails to acknowledge what SJR 38 *would actually* do – substantially modify, and reorder, the redistricting criteria approved by voters in the November 2018 general election. We have described in the factual statement above the modifications SJR 38 would make to individual redistricting criteria. In addition, the resolution would take two of the new criteria approved by

person, one vote" was coined); *Evenwel v. Abbott*, 136 S. Ct. 1120, 1123-24 (2016) (discussing evolution of "one person, one vote" principle in Supreme Court's jurisprudence).

voters in 2018 – "partisan fairness" and "competitiveness" – and not only

substantially dilute them,[12] but also move these considerations from the very

highest priority category (above geographic contiguity, preservation of existing

political subdivisions, and compactness) to the very lowest priority. Like the

creation of the position of Nonpartisan State Demographer, the heavy weighting of

"partisan fairness" and "competitiveness" is a distinctive feature of the modified

redistricting process which voters approved in 2018; yet the proposed ballot

summary does nothing to suggest that these criteria are being substantially revised

and deprioritized.

The first sentence of the Introduction to the Secretary of State's opening Brief

lists what he contends are the four primary features of SJR 38. Notably, in that

first sentence, the Secretary of State emphasizes that the resolution would, if

enacted, "(4) *amend, clarify, and reorder* the criteria used in redistricting."

(Emphasis added.) Yet this critical feature of SJR 38 – which the Secretary of State

---

[12]    Under the existing Constitution as amended by Amendment No. 1, the Nonpartisan State Demographer is charged with employing the "partisan fairness" and "competitiveness" criteria to "ensure the difference between the two parties' total wasted votes, divided by the total votes cast for the two parties, is *as close to zero as practicable*." Art. III, § 3(c)(1)b (emphasis added). Under SJR 38, the bipartisan commissions are instructed that this ratio, referred to as "the efficiency gap," "*shall not exceed fifteen percent*." (Emphasis added.) By permitting an efficiency gap as high as fifteen percent, SJR 38 would apparently permit a very heavy partisan bias in redistricting plans. As one court has explained:

> *A 7 percent efficiency gap is at the edges of the overall distribution of all state house plans in the modern era, making it indicative of uncommonly severe gerrymandering*. Historical analysis shows that with a 7 percent efficiency gap, the gerrymandering is also likely to be unusually durable. Over its lifespan, a plan with an efficiency gap of that magnitude is unlikely ever to favor the opposing party.

*Whitford v. Nichol*, 151 F. Supp.3d 918, 922 (W.D. Wis. 2015) (emphasis added); *see also* Nicholas O. Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 U. CHI. L. REV. 831, 887 (2015) (recommending a maximum eight percent efficiency gap for state house plans; recognizing that "[a] gap of at least eight points placed a [state house redistricting] plan in the worse 12 percent of all plans" over the last five decades).

so prominently highlights in his Brief – is nowhere mentioned in the official summary statement.

Notably, after acknowledging that modification of the existing redistricting criteria is a primary feature of SJR 38, the Secretary of State admits in his Brief that the third bullet point's listing of redistricting criteria is completely opaque concerning the genesis of those criteria:

> The bullet point does not make any statement whether the listed criteria will be new or preexisting. It simply states that the new independent bipartisan commissions will "draw state legislative districts *based on*" the criteria listed in the bullet point. The summary makes no statement, one way or the other, about whether these criteria are the same, similar to, or different from criteria that are already used.

(Record citations omitted.) But this is precisely the problem – given that the third bullet point asks voters whether "the Missouri Constitution [should] be amended to . . . [c]reate . . . commissions to draw state legislative districts based on" the listed criteria, it falsely implies that those criteria will only become effective if the amendment passes. Moreover, in the quoted passage the Secretary candidly admits that the third bullet point gives voters absolutely no notice of the significant revisions to the existing redistricting criteria effected by SJR 38.

*     *     *     *     *

In order to address the deficiencies in the third bullet point which we have discussed above, we have drafted revised language for the third bullet point.

As pointed out by Challengers, this is apparently only the second time when we have addressed a situation in which a proponent has sought to put a measure on a general election ballot which would have the effect of substantially altering or undoing a measure which voters approved at the immediately preceding general election. In that earlier case, *Cures Without Cloning v. Pund*, 259 S.W.3d 76 (Mo. App. W.D. 2008), we upheld language in a summary statement drafted by the

33

Secretary of State, which stated that the initiative sought "to limit Missouri patients' access to stem cell research, therapies and cures *approved by voters in November 2006* by [adopting certain restrictions]." *Id.* at 80 (emphasis added). The Missouri Supreme Court has recognized that "[s]ometimes it is necessary for the . . . summary statement to provide a context reference that will enable voters to understand the effect of the proposed change." *Brown*, 370 S.W.3d at 654. As in *Cures Without Cloning*, we believe that voters need to be informed that they are being asked to reconsider, and substantially modify, a measure which they only recently approved.

Accordingly, we strike the existing third bullet point, and replace it with the following:

Shall the Missouri Constitution be amended to:

. . . .

- Change the redistricting process voters approved in 2018 by: (i) transferring responsibility for drawing state legislative districts from the Nonpartisan State Demographer to Governor-appointed bipartisan commissions; (ii) modifying and reordering the redistricting criteria.

We recognize that, in its judgment, the circuit court reversed the order of the bullet points of the summary statement drafted by the General Assembly, putting the redistricting issue first, the campaign contribution limitations second, and the gift restrictions third. The court also substantially rewrote each of the summary's three bullet points. While we have substantially rewritten the third bullet point to address the specific deficiencies we have described above, and have slightly modified the wording of the first bullet point, we do not engage in any broader revision or reordering of the summary's provisions, and believe it was error for the circuit court to make more far-reaching modifications. We have previously explained that, after identifying deficiencies in a ballot summary, we will revise the

34

existing summary "while modifying the [existing] language in the most limited fashion possible." *Boeving*, 493 S.W.3d at 883; *see also Cures Without Cloning*, 259 S.W.3d at 83 (while circuit court was authorized to change a single word of summary statement to correct a deficiency, "the court was not authorized to re-write the entire summary statement"). We follow that same path here. Accordingly, we do not reorder the summary statement's bullet points, which are fair and sufficient as rewritten, and follow the order in which the three items appear in SJR 38 itself. Nor do we modify the language of the existing summary more broadly than necessary to address the specific deficiencies we have identified.

## Conclusion

For the reasons explained above, the circuit court's judgment is affirmed in part and reversed in part.

It is now well-established "that § 116.190.4 authorizes the circuit court to certify alternative language to the Secretary of State where the circuit court finds the existing summary statement language to be deficient. We have also held that, where this Court concludes that the summary statement is insufficient or unfair, we 'step into the circuit court's shoes' by virtue of Supreme Court Rule 84.14." *Boeving v. Kander*, 493 S.W.3d 865, 882 (Mo. App. W.D. 2016). Accordingly, we certify the following summary statement for inclusion in the official ballot title for Amendment No. 3, to appear on the November 3, 2020 general election ballot:

Shall the Missouri Constitution be amended to:

- Ban gifts from paid lobbyists to legislators and their employees;

- Reduce legislative campaign contribution limits;

- Change the redistricting process voters approved in 2018 by: (i) transferring responsibility for drawing state legislative districts from the Nonpartisan State Demographer to Governor-appointed bipartisan commissions; (ii) modifying and reordering the redistricting criteria.

In compliance with § 116.155.2, this modified summary statement consists of fifty words, excluding articles.

_____
Alok Ahuja, Judge

All concur.